IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MIREILLE M. LEE,            )
                                   )
        Plaintiff,           )         No. 3:20-cv-00924
                                     )
v.                                   )         JUDGE RICHARDSON
                                     )
THE VANDERBILT UNIVERSITY,    )
                                     )
        Defendant.         )

## MEMORANDUM OPINION

Pending before the Court is a motion for summary judgment (Doc. No. 465, "Motion"),

filed by the Vanderbilt University (hereinafter "Vanderbilt" or "Defendant"). Via the Motion,

Defendant moves the Court for summary judgment on the claims of Plaintiff, Mireille M. Lee. (*Id.*

at 1). Defendant has filed a memorandum of law (Doc. No. 466, "Opening Brief")[1] in support of

the Motion, along with a "Statement of Undisputed Material Facts in Support of its Motion for

Summary Judgment" (Doc. No. 467, "Defendant's Undisputed Material Facts").[2] Plaintiff filed a

response (Doc. No. 494, "Response") in opposition to the Motion, along with a response (Doc.

No. 492, "Undisputed Material Facts Response") to Defendant's Undisputed Material Facts.

Plaintiff also filed a "Statement of Additional Uncontested Material Facts Which Demonstrate

Vanderbilt Is Not Entitled to Summary Judgment" (Doc. No. 490, "Plaintiff's Additional

---

[1] This is a redacted version of the Opening Brief. An unredacted version of the Opening Brief is under seal at Docket No. 473-1. For obvious reasons, herein the Court will cite to the redacted version.

[2] This is a redacted version of Defendant's Undisputed Material Facts. An unredacted version of Defendant's Undisputed Material Facts is under seal at Docket No. 473-2. For obvious reasons, herein the Court will cite to the redacted version.

Statement"). Defendant has filed a reply (Doc. No. 513, "Reply")[3] in further support of the Motion, as well as a response (Doc. No. 514, "Additional Statement Response")[4] to Plaintiff's Additional Statement.

Also pending before the Court is a motion to strike (Doc. No. 533, "Motion to Strike") filed by Defendant, which seeks, in relevant part, to strike in whole or in part Plaintiff's Additional Statement (Doc. No. 490).[5] Defendant has filed a memorandum (Doc. No. 534, "Motion-to-Strike Opening Brief") in support of the Motion to Strike. Plaintiff has filed a response (Doc. No. 544, "Motion-to-Strike Response") in opposition to the Motion to Strike and Defendant has filed a further reply (Doc. No. 551, "Motion-to-Strike Reply") in further support of the Motion to Strike.

For the reasons described herein, the Court will **GRANT** the Motion for Summary Judgment and **GRANT** in part and **DENY** in part the Motion to Strike.

<u>MOTION TO STRIKE</u>[6]

Before addressing the Motion, the Court will first address the Motion to Strike. As background, Plaintiff's Additional Statement—the document Defendants seek to have stricken—

---

[3] This is a redacted version of the Reply. An unredacted version of the Reply is under seal at Docket No. 516-1. For obvious reasons, herein the Court will cite to the redacted version.

[4] This is a redacted version of the Additional Statement Response. An unredacted version of the Additional Statement Response is under seal at Docket No. 516-2. For obvious reasons, herein the Court will cite to the redacted version.

[5] The Motion to Strike also sought to strike a statement of undisputed material facts (Doc. No. 462) filed by Plaintiff in connection with Plaintiff's motion for summary judgment (Doc. No. 458). The Court denied in an order (Doc. No. 578) Plaintiff's motion for summary judgment (Doc. No. 458), and so the Motion to Strike's requested relief with respect to seeking to strike Plaintiff's statement of undisputed material facts (Doc. No. 462) filed in connection with her own motion for summary judgment (Doc. No. 458) is moot.

[6] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

states that it "sets forth the following additional *uncontested* material facts which demonstrate that defendant Vanderbilt is not entitled to summary judgment." (*Id.*) (emphasis added).

The 2020 Local Rules provided authorization and requirements for non-movants submitting a statement of facts when faced with a motion for summary judgment.[7] In pertinent part, they provided:

> [The] non-movant's response [to the movant's statement of facts] may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact must be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute. A copy of the statement of additional disputed facts must also be provided to opposing counsel in an editable electronic format.

2020 LR 56.01(c)(3).

In other words, the 2020 Local Rules plainly contemplated non-movants filing a statement of *disputed* facts—not a statement of "uncontested facts."

As relevant here, Defendant argues as follows:

> Plaintiff's Additional Statement . . . does not comply with Local Rule 56.01 and should be stricken in its entirety for a distinct reason: Under Local Rule 56.01, the non-movant may file "a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." L.R. 56.01(c)(3). Local Rule 56.01 further provides that "[e]ach such disputed fact must be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute." *Id.*

> Plaintiff's Additional Statement violates both these provisions. First, Plaintiff did not file a statement of additional disputed facts, as the rule requires, but rather a statement of purportedly "uncontested" facts. This error, in and of itself, constitutes sufficient grounds to strike Plaintiff's Additional Statement in its entirety. *See, e.g.*, *Sales*, 2014 WL 1883936, at *1 (striking the plaintiff's undisputed additional facts

---

[7] Notably, and as relevant here, at the time Plaintiff's Additional Statement was filed, the version of the Local Rules in effect was dated January 24, 2020, and, in the briefing on the Motion to Strike, the parties refer to the version of the Local Rules dated January 24, 2020. The Court will rely on this version of the Local Rules when considering both the Motion to Strike and the Motion, and herein it will refer to this version of the Local Rules as "2020 Local Rule[s]" or "2020 LR."

because they did not comply with Local Rule 56.01); *see also Singh*, 2019 WL 6878146, at *1.

Moreover, like the additional statement filed by the plaintiff in *Sales*, Plaintiff's Additional Statement "fails to meet the Local Rule's requirement of brevity." *Sales*, 2014 WL 1883936, at *1. In *Sales*, the court made this finding because the 117-paragraph additional statement included "at least two redundant facts which had been addressed in the [statement of undisputed material facts]" as well as "a handful of speculative legal conclusions that are improperly included as facts." *See id.* Here, as explained above and inventoried in the attached Appendix, Plaintiff has included many purported statements with at least one critical deficiency. Accordingly, the Court should strike Plaintiff's Additional Statement in its entirety.

(Doc. No. 534 at 10-11) (footnote omitted). In response to this argument, Plaintiff argues that:

At page 9 of its [Motion-to-Strike Opening Brief] defendant Vanderbilt complains about the title of plaintiff's Additional Statement of Facts claiming that the title should have been "Disputed" instead of "Uncontested". Plaintiff did anticipate that defendant Vanderbilt would dispute each of the facts (which it did) but, at the time plaintiff filed the Additional Statement, defendant Vanderbilt had not yet disputed these facts. Plaintiff chose not to burden this Court with a motion to change its title after Vanderbilt filed its lengthy dispute to each of the facts.

Plaintiff Lee did follow this Court's guidance in preparing her Statement of Material Facts. Plaintiff Lee deleted many of the facts set forth in her original Statement of Facts filed with her April 2022 Motion for Summary Judgment. A comparison of the Statement of Material Facts filed in April 2022 D.E. 240 with the Statement of Material Facts filed in November 2024 shows that plaintiff Lee omitted many facts and revised many others in order to comply with this Court's admonitions concerning Statements of Material Fact.

(Doc. No. 544 at 4).[8]

As an initial matter, the Court notes that Defendant's argument seeking to strike Plaintiff's Additional Statement is meritorious, as it does indeed appear that Plaintiff's Additional Statement is not compliant with the 2020 Local Rules. Plaintiff's argument in response to the Motion to Strike is unavailing. First, the problem with Plaintiff's Additional Statement is not merely with its (full)

---

[8] Indeed, the Court notes that in its Motion-to-Strike Opening Brief, Defendant does not merely take issue with Plaintiff's Additional Statement's *title*. Defendant also argues that Plaintiff's Additional Statement includes various statements "with at least one crucial deficiency" (Doc. No. 534 at 10). These deficiencies are explained further in an appendix (Doc. No. 534-1) filed as an exhibit to the Motion-to-Strike Opening Brief.

title, which, as noted above is: "Statement of Additional *Uncontested* Material Facts Which Demonstrate Vanderbilt Is Not Entitled to Summary Judgment." (Doc. No. 490 at 1) (emphasis added). The problem is that Plaintiff's Additional Statement (whatever its title) is in substance—as described in Plaintiff's own words—a statement of "additional uncontested material facts which demonstrate that defendant Vanderbilt is not entitled to summary judgment." (Doc. No. 490 at 1). This is plainly not the kind of filing that was contemplated by the 2020 Local Rules, which, as noted just above, contemplated a non-movant filing a concise statement of additional facts that "the non-movant contends are material and as to which the non-movant contends *there exists a genuine issue to be tried*. Each such *disputed* fact must be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in *dispute*."[9] 2020 LR 56.01(c)(3) (emphasis added). In other words, the 2020 Local Rules did *not* contemplate a statement of "uncontested facts" such as was submitted by Plaintiff. Indeed, this Court previously (when considering an earlier version of the Local Rules than the one applied by the Court herein but that, in relevant part, contained similar language to 2020 Local Rule 56.01(c)(3)),[10] found that a non-movant facing a motion for summary judgment is not permitted

---

[9] It is readily inferable why the local rule authorizes a statement of *disputed* material facts, rather than undisputed material facts. Specifically, it seems that the most direct (and most common) way for a non-movant to show that summary judgment is inappropriate is to show that there exists at least one genuine (disputed) issue of material fact to be tried. True, there is a way to show the inappropriateness of summary judgment by using *undisputed* facts; in particular, in some cases *undisputed* facts can show that the movant is not entitled to judgment as a matter of law. But it strikes the undersigned that the primary way to defeat a summary-judgment motion is to show that there are genuinely disputed issues of material fact (which are sometimes, as in the local rule here, called "disputed facts" or "material disputed facts" for short).

[10] In relevant part, the version of the Local Rules that the Court in *Sales* considered contained the following language:

> Any party opposing the motion for summary judgment must respond to each fact set forth by the movant . . . Such response shall be filed with the papers in opposition to the motion for summary judgment. In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried.

by the Local Rules "to file a statement of additional *undisputed* facts," *Sales v. inVentiv Health, Inc.*, No. 3:13-CV-0064, 2014 WL 1883936, at *1 (M.D. Tenn. May 12, 2014), and on those grounds struck from the record a statement of *undisputed* facts submitted by a non-movant in response to a motion for summary judgment. *Id.* Accordingly, the striking of Plaintiff's Additional Statement is justified on the bare fact of its being a statement of "uncontested facts."

However, this Court in its discretion has allowed non-moving parties to file statements of additional undisputed (i.e., uncontested) facts when faced with a motion for summary judgment when such statements are helpful to the Court. *See Lopez v. Metro. Gov't of Nashville & Davidson Cnty.*, 646 F. Supp. 2d 891, 906 (M.D. Tenn. 2009) ("The Motions to Strike additional statements of undisputed facts will be denied. Those statements amplify the issues and, for the most part, were filed in an effort to contradict statements made in the opponents' statements of undisputed facts."). Thus, in some circumstances the Court might decline to strike Plaintiff's Additional Statement and thus consider Plaintiff's Additional Statement in connection with Defendant's Motion despite Plaintiff's Additional Statement's non-compliance with the 2020 Local Rules. Here, however, Plaintiff's Additional Statement contains another critical flaw: many of the statements Plaintiff has filed are not made with "specific citations to the record supporting the contention that such fact is in dispute" as was required by the 2020 Local Rules. 2020 LR 56.01(c)(3). For example, the statement at paragraph 13 in Plaintiff's Additional Statement is made with only a citation to the "Lee Affidavit" without any indication as to where the Lee Affidavit is in the record (i.e., where the Lee Affidavit is located on the docket) or a pin cite within the "Lee Affidavit" to a specific piece of information therein supporting Plaintiff's assertions. (Doc. No. 490 at ¶ 13). The statement at paragraph 44 is made without citation to *any* supporting authority. (*Id.* at ¶ 44). These are only

---

*Sales v. inVentiv Health, Inc.*, No. 3:13-CV-0064, 2014 WL 1883936, at *1 (M.D. Tenn. May 12, 2014).

a few of the issues in Plaintiff's Additional Statement, which is replete with citations (such as citations to what the Court discerns are bates numbers (*id.* at ¶¶ 33-40) without any indication to where in the record the document that Plaintiff is citing is located) made without the specificity required by the 2020 Local Rules. This will not do—and renders Plaintiff's Additional Statement entirely unhelpful to the Court in deciding the Motion. Indeed, if the Court were to decline to strike, and thus consider Plaintiff's Additional Statement, the Court would be required to expend valuable and limited resources in combing through the record to determine whether Plaintiff's statements are supported by the record. *Cf. Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 734, 736 (6th Cir. 2011) ("[C]ourts need not independently comb through the record and establish that it is bereft of a genuine issue of material fact before granting summary judgment. . . . Judges are not like pigs, hunting for truffles.").

Accordingly, the Court will **GRANT** the Motion to Strike (Doc. No. 533) to the extent it seeks to strike Plaintiff's Additional Statement (Doc. No. 490) and will decline to consider Plaintiff's Additional Statement in considering the Motion. The Motion to Strike also seeks to strike a statement of undisputed material facts (Doc. No. 462) filed in connection with Plaintiff's motion for summary judgment (Doc. No. 458). The Court previously denied in an order (Doc. No. 578) Plaintiff's motion for summary judgment (Doc. No. 458), and so the Motion to Strike will be **DENIED** as moot to the extent that it requests to strike Plaintiff's statement of undisputed material facts (Doc. No. 462) filed in connection with Plaintiff's motion for summary judgment (Doc. No. 458).

<u>LEGAL STANDARD</u>

**I.     Summary Judgment Standards, Generally.**

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. United Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary-judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support the [existence of a] material fact," Fed. R. Civ. P. 56(c)(1)(B), for example, the existence of an element of a nonmovant plaintiff's claim. If the

summary-judgment movant meets its initial burden, then in response the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman*, 901 F.3d at 628 (quoting *Anderson*, 477 U.S. at 250).[11] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322). *See also Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 115 F. App'x 806, 811 (6th Cir. 2004) ("The non-moving party may not rely on mere allegations and assertions in his pleadings, but rather must present specific facts that show that there is some material issue warranting a trial. If the non-moving party cannot meet this burden, summary judgment is appropriate." (citing *Nichols v. Moore,* 2004 WL 2039356, at *3 (E.D. Mich. Sept. 3, 2004)).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively) can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1)(B).

---

[11] Courts (appropriately) at times refer interchangeably to (i) a party being able (or unable) to raise a genuine issue as to fact and (ii) a reasonable jury being able (or unable) to find in the party's favor on that fact. This Court does likewise herein.

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (citing *Anderson*, 477 U.S. at 248). Likewise, the "court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman*, 901 F.3d at 628 (citing *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A defendant-movant cannot meet its initial burden on a motion for summary judgment merely by *claiming* that the plaintiff lacks evidence and essentially challenging the plaintiff to show otherwise; a defendant-movant must—by pointing to materials of record or otherwise—*show* (presumptively, subject to the plaintiff's response) that the plaintiff could not prove his claim by a preponderance. *See* Fed. R. Civ. P. 56(c)(1).[12] In other words, the defendant-movant must produce

---

[12] The undersigned rejects cases that have indicated otherwise. *See, e.g.*, *O.M.A., S.r.l. v. Simon DeYoung Corp.*, No. 1:10CV0861, 2013 WL 7210503, at *3 (N.D. Ohio Mar. 12, 2013) ("[A summary judgment] movant in federal court is not required to . . . provide evidence to show that his opponent has no evidence"), *R&R adopted in part, rejected in part on other grounds*, No. 1:10 CV 00861, 2014 WL 587171 (N.D. Ohio Feb. 14, 2014); *Goldcorp, Inc. v. United States*, No. 00-75043, 2002 WL 551042, at *6 (E.D. Mich. Mar. 27, 2002) ("At any rate, even if [the] affidavit were altogether stricken from the record, it appears that the Government still would be entitled to summary judgment in its favor. After all, this affidavit has been provided merely to prove a negative: namely, that there is no evidence that the IRS ever received the protective claim allegedly sent by Plaintiff on or before September 15, 1995. Presumably, then, the

evidence *tending to show* (though not necessarily *conclusively showing*) that the plaintiff cannot raise a genuine issue as to any material fact.[13] *Nickols v. Morris*, 705 F. Supp. 2d 579, 584–85 (N.D. Tex. 2010) ("The party moving for summary judgment has the initial burden of informing the Court of the basis for his motion and producing evidence which tends to show that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter of law."), *aff'd*, 419 F. App'x 534 (5th Cir. 2011).

## II.     Summary Judgment Standards as Relevant to the *McDonnell Douglas* Framework

The Court will provide here[14] an overview of the so-called *McDonnell Douglas* framework (a special device for adjudicating employment discrimination and retaliation claims) and its applicability to motions for summary judgment in particular.[15] The Sixth Circuit has summarized

---

Government could have simply asserted this proposition in its brief, and left it to Plaintiff to introduce evidence calling this issue into question.").

[13] Notably, a defendant-movant typically can show that there is no genuine issue as to any material fact by showing that there is no genuine issue as to the existence of a fact (usually, the element of a claim) that absolutely needs to exist for the plaintiff to prevail. If the defendant-movant can make this showing, all other facts become immaterial (because the plaintiff necessarily will suffer summary judgment anyway), and thus it can be said that the plaintiff (being unable to show a genuine issue as to *one* material fact) cannot raise a genuine issue as to *any* material fact.

[14] Below, the Court will discuss in much greater detail the *McDonnell Douglas* framework, particularly as it is to be applied in the summary-judgment context.

[15] *McDonell Douglas* was an appeal after a bench trial, not an appeal after a decision on a motion for summary judgment. In the view of the undersigned, this is important to keep in mind, because it explains why a court addressing a motion for summary judgment cannot just plunk down the language from *McDonnell Douglas* and apply it just as written, without accounting for the specific burden-shifting analysis required on every summary-judgment motion; it is vital that when the *McDonnell Douglas* framework is used on a summary-judgment motion—something Justice Thomas seriously doubts should ever happen, *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 322 (2025) (Thomas, J., concurring)—the framework be modified to account for the legal standard applicable to summary-judgment motions. *Id.* at 323 ("If courts are to apply *McDonnell Douglas* at summary judgment, they must modify the framework to match the applicable legal standard.") Herein, and per its usual practice, the undersigned has done its level best to make such modifications—sometimes expressly, sometimes not expressly, but always with intentionality.

Such modifications are not particularly easy to make (or explain), due to the "complex issues related to the interplay of the summary judgment standard and *McDonnell Douglas*." *Qualls v. Regents of the Univ. of California*, No. 113CV00649LJOSMS, 2015 WL 6951757, at *3 (E.D. Cal. Nov. 10, 2015). The

the applicability and workings of the *McDonnell Douglas* burden-shifting framework (in a case that happened to involve Title VII[16] discrimination claims in particular, as does the instant case, in part) as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . .. Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

The Sixth Circuit expounds on the respective burdens on the parties in the context of *McDonnell Douglas* in the following manner:

> [When a] discrimination plaintiff bases his case on indirect evidence (i.e., evidence requiring inferences to reach the conclusion that the defendant discriminated against the plaintiff), we apply the burden-shifting framework first set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 802–05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Rowan,* 360 F.3d at 547; *Town v. Mich. Bell Tel. Co.,* 455 Mich. 688, 568 N.W.2d 64, 67–68 (1997). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir. 2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996) (applying the *McDonnell Douglas* framework to a disability-discrimination

---

complexity arises from the fact that the Court must layer one burden-shifting framework (the summary-judgment standard) on top of another burden-shifting framework (*McDonnell Douglas*).

[16] As relevant here (as will become clearer below), "although the legal framework [concerning both indirect and direct evidence discrimination and retaliation claims that is examined herein] . . . describes 'Title VII,' the legal principles [applicable to Title VII] likewise apply to [42 U.S.C.] § 1981 and [the] THRA." *Smith v. P.A.M. Transp., Inc.*, No. 3:21-CV-00262, 2024 WL 2097102, at *7 n. 26 (M.D. Tenn. May 9, 2024), *rev'd and remanded on other grounds*, 154 F.4th 375 (6th Cir. 2025).

claim). The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

*Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009).

The burden-shifting approach in *McDonnell Douglas* applies only to discrimination or retaliation claims premised on so-called indirect (i.e., circumstantial) evidence.[17] *Redlin,* 921 F.3d at 606–07. The undersigned previously has explained how the *McDonnell Douglas* framework functions in the context of a defendant's motion for summary judgment:

When a defendant-movant challenges a plaintiff's ability to reach a jury on an indirect-evidence theory of employment discrimination, there are a number of steps potentially implicated, though not all of them necessarily need be addressed in the analysis. The number of steps to be addressed depends on whether the defendant-movant seeks to prevail at the first step, or at the second and third step, or at both the first step and the second and third step . . .

To prevail at the first step of *McDonnell-Douglas*, the defendant, as the summary-judgment movant, must meet its initial burden of showing an absence of evidence from which a reasonable jury could find the plaintiff established a *prima facie* case. *E.g., Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). If the defendant does so, then the burden shifts to the plaintiff to show that at trial it could "make out a *prima facie* case of discrimination by a preponderance of the evidence." *Redlin*, 921 F.3d at 606. If the plaintiff fails to succeed here, then the plaintiff suffers summary judgment in favor of the defendant on the claim. But if the plaintiff succeeds here, defendant does not prevail at the first step and is relegated to try instead to prevail at the second and third steps of *McDonnell-Douglas*.

---

[17] "Direct evidence is such that, if true, requires the conclusion that unlawful retaliation [or discrimination] was a motivating factor without any inferences or presumptions." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 693 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999)). Indirect evidence is evidence that requires the court to make inferences to conclude that unlawful retaliation or discrimination was a motivator for an adverse employment action.

At the second step, the defendant-movant has the burden (of production only) to show a legitimate and non-discriminatory reason for its action(s). *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). If the defendant successfully shows evidence of a non-discriminatory reason for its alleged discriminatory act, the court proceeds to the third step, where "the plaintiff must rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext" for unlawful discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotations omitted).

*Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 1231229, at *9-10 (M.D. Tenn. Apr. 26, 2022) (Richardson, J).

Notably, at the third and final stage of *McDonnell Douglas*, the question on *summary judgment* (as opposed to a bench trial) is not whether *the court finds* pretext by a preponderance of the evidence, but rather whether *a reasonable jury could find* pretext by a preponderance of the evidence. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 323 (2025) (Thomas, J., concurring) ("[A]t the third step [on a motion for summary judgment, the question for the court cannot be [as suggested by *Burdine*, which was on appeal from a bench trial] whether the plaintiff has 'prove[d] by a preponderance of the evidence that the legitimate reasons offered by the defendant . . . were a pretext for discrimination.' *Burdine*, 450 U.S. at 251. Instead, the plaintiff need only present sufficient evidence to create a 'genuine dispute as to" whether the employer's stated reason was pretextual.' Rule 56(a)"); *Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 358 (6th Cir. 2012) (stating on motion for summary judgment in Title VII case, "at the pretext stage [the plaintiff must show that a reasonable jury could infer that the [defendant's] professed reasons are unworthy of credence."); *Bell v. Runyon*, No. CIV. 96-374 (TFH), 1997 WL 540814, at *3 n.1 (D.D.C. July 17, 1997) (stating on motion for summary judgment in Title VII case, "[t]he Court agrees with plaintiff that he need not, at this stage, demonstrate pretext by a preponderance of the evidence.

He must, however, present sufficient evidence that a reasonable jury could find pretext by a preponderance of the evidence.") *aff'd*, No. 97-5245, 1998 WL 65536 (D.C. Cir. Jan. 30, 1998). For ease of discussion, however, the Court herein generally will refer to the plaintiff's pretext-related burden simply as preponderance of the evidence, without specifically referring to the fact that "preponderance of the evidence" is viewed from the vantage point of what a reasonable jury *objectively could find*, and not from the vantage point of what the undersigned district judge *subjectively does find*.

In the Court's view, what the summary judgment analysis boils down to, stated as concisely as possible (which, alas, is not particularly concise), is set forth in the following paragraph.

To obtain summary judgment on Title VII claims (or, as relevant here (and as noted in a footnote above) on 42 U.S. Code § 1981 and Tennessee Human Rights Act claims) grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either:

> (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that,
> (ii) (a) make an evidentiary showing[18] adequate to support a finding that there was a legitimate, nondiscriminatory reason for its alleged actions <u>and</u> then (b) have the plaintiff fail to raise a genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext).

On the other hand, the plaintiff will avoid summary judgment if:

> (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's indirect-evidence *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; <u>and</u>

---

[18] To be clear, the requirement here is not merely to *articulate* a legitimate reason, but also (as discussed below) to *present evidence* that the articulated legitimate reason was in fact the reason.

(ii) either (a) the defendant cannot make an adequate evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.[19]

Plaintiff's claims for sex discrimination and retaliation under Title VII, 42 U.S. Code § 1981 ("Section 1981" or "§ 1981"), and the Tennessee Human Rights Act ("THRA") are subject to *McDonnell Douglas*, at least to the extent they rely on indirect-evidence.[20]

## III. Summary Judgment Standards as Relevant to Direct Evidence

As an alternative to indirect evidence, a plaintiff seeking to establish a claim of discrimination or retaliation, by which the Court here[21] means a claim that the plaintiff suffered *an adverse employment action based on discriminatory or retaliatory animus*, may seek to establish her case via direct evidence. Also, the Court notes that although the cases discussed in

---

[19] As indicated below, courts' references to a plaintiff's (conditional) requirement to show "pretext" is actually a (conditional) requirement to show not just pretext (*i.e.*, that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

[20] As noted in a footnote above, "although the legal framework discussed herein describes 'Title VII,' the legal principles likewise apply to § 1981 and THRA." *Smith*, 2024 WL 2097102, at *7 n. 26, *8.

[21] The Court uses these shorthand terms in order to be precise as to what kinds of claims it is talking about and the distinctions between them. By so doing, the Court does not mean to suggest that "retaliation" is entirely distinguishable from discrimination. Indeed, the Court is fully aware that retaliation in violation of Title VII is sometimes referred to as a form of discrimination.

In fact, the part of Title VII that creates a cause of action for retaliation, 42 U.S.C. § 2000e-3(a), refers to retaliation as a form of discrimination. This is typical of civil rights statutes. *See, e.g., Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (stating in the context of Title IX that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination"). That is not to say that retaliation is always treated just like non-retaliation forms of discrimination; sometimes it is treated differently from general discrimination, and when that happens it is usually treated differently in a way that favors the plaintiff. *See Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 (6th Cir. 2019) ("Although we had previously held that the same requirements [for something to rise to the level of an actionable adverse employment action] apply to Title VII retaliation claims and Title VII discrimination claims, the Supreme Court made clear in *Burlington Northern* that [such] requirements for a retaliation claim are in fact considerably less stringent." (*citing Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-69 (2006) (rejecting the Sixth Circuit's contrary view))). But for present purposes, it is enough to note that the Court hereinafter generally uses the term "retaliation" to refer solely to discrimination in the form of (naturally) retaliation, while reserving the term discrimination for the non-retaliation form of discrimination—i.e., discrimination based on class or classification, which the Court above has referred to as "general" discrimination.

this section are framed in terms of *discrimination* (i.e., adverse employment actions taken against persons based on their membership in a protected class), the discussion is equally applicable to *retaliation (*i.e., adverse employment actions taken against persons based on their having engaged in conduct that is protected by Title VII).[22] As will be explained further below, only *retaliation* and *discrimination* are alleged in this case.

"[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.'" *Bartlik v. U.S. Dep't of Lab.*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When there is direct evidence, "the existence of unlawful discrimination is 'patent.'" (*Id.*). In other words, direct evidence is evidence that shows patently that the allegedly unlawful actions were motivated by animus against persons in protected classes, rather than solely by other considerations.

"'Whatever the strength of the evidence, it is not 'direct' evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact.'" *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (quoting *Norbuta v. Loctite Corp.*, 1 F. App'x. 305, 313 (6th Cir. 2001)). If an inference is required to draw from the evidence the conclusion that an employer had an animus against a protected class—for example, if an inference is required to reach the conclusion that a comment refers to a

---

[22] As noted above, although the Court discusses direct evidence herein frequently within the context of Title VII, the legal principles applied to direct evidence Title VII discrimination and retaliation claims likewise apply to Section 1981 and THRA claims. *Smith*, 2024 WL 2097102, at *7 n. 26, *8 (applying the same principles to Title VII, Section 1981, and THRA claims when considering direct evidence).

protected class or the plaintiff's membership in a protected class—then the evidence is not direct evidence. *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 825 (N.D. Ohio 2006). And to be direct evidence, "the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [a protected characteristic], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

"Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin v. Potter*, 79 F. App'x 893, 896-97 (6th Cir. 2003). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).

"Direct evidence and circumstantial evidence claims run on parallel tracks, and therefore failure to sustain a claim under one framework does not undermine the other." *Erwin*, 79 F. App'x at 899. Another way to put it is to say that a plaintiff can establish a *prima facie* case of discrimination not only by establishing the defined elements of an indirect-evidence *prima facie* case, but alternatively by presenting evidence that qualifies as direct evidence of discrimination.[23]

---

[23] Often, courts seemingly speak as if the only kind of *prima facie* case of discrimination is an indirect-evidence *prima facie* case. But other cases imply that the presentation of direct evidence functions to establish a (different kind of) *prima facie* case of discrimination. *See e.g.*, *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 911 (6th Cir. 2009) ("As in the direct evidence context, a plaintiff relying on indirect evidence still must make a *prima facie* showing of discrimination."); *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 830 (6th Cir. 2000) ("[D]irect evidence of discrimination merely suffices to establish a *prima facie* case, which shifts the burden of production to the employer to come forward with a non-pretextual reason for its decision[.]") (Norris, J., concurring); *Thompson v. Hendrickson USA, LLC*, No. 3:20-CV-00482, 2021 WL 848694, at *19 n.20 (M.D. Tenn. Mar. 5, 2021) ("Plaintiff might meet her *prima facie* case in various ways, including via direct evidence[.]") (Richardson, J.); *Woodsmall v. Eclipse Mfg. Co.*, 249 F. Supp. 2d 918, 923 (E.D. Tenn. 2002) ("[P]laintiff has sustained his burden of demonstrating a *prima facie* case of discrimination with direct evidence. . . . . In the alternative, Woodsmall can establish a *prima facie* case of discrimination based upon circumstantial evidence."). The Court agrees with such cases; to establish a *prima facie* case means, essentially, to establish a case preliminarily, subject to the other side's opportunity (and requirement) to rebut that case. And that is exactly what a plaintiff does *either* by presenting direct evidence *or* by establishing each of the elements of an indirect *prima facie* case under *McDonnell Douglas*.

The upshot is that a plaintiff at the summary-judgment stage has the option of meeting her burden by showing direct evidence, indirect-evidence, or both kinds of evidence. *See e.g.*, *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381–82 (6th Cir. 2002) ("It is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* formula." (citation omitted)); *Hicks v. U.S. Off. of Pers. Mgmt.*, No. 2:05CV100, 2006 WL 8441765, at *2 (S.D. Ohio June 20, 2006) ("In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive."); *Diaz v. City of Inkster*, No. CIVA05-CV-70423-DT, 2006 WL 2192929, at *9 (E.D. Mich. Aug. 2, 2006) ("Plaintiff's presentation of direct evidence means that the burden-shifting paradigm (for indirect-evidence) does not apply.").[24]

In determining whether discriminatory acts (or comments made with animus) constitute direct evidence, courts often look for a "temporal proximity between the discriminatory act and the termination [or other adverse employment action]." *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) (deeming comments made by the plaintiff's supervisor, suggesting animus against

---

[24] The quote from *Diaz* calls to mind an important distinction. If the plaintiff presents direct evidence, then (as *Diaz* states) the burden-shifting paradigm *for indirect-evidence* does not apply, but a different kind of burden-shifting does apply. Specifically, "[w]hen a plaintiff establishes discrimination through direct evidence, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Blair*, 505 F.3d at 523. This one-step, uni-directional burden-shifting is not the potentially two-step and bi-directional burden-shifting prescribed by *McDonnell Douglas*, but it is a kind of burden-shifting nonetheless. It is important to keep these differences in mind. *See Erwin v. Potter*, 79 F. App'x 893, 899 (6th Cir. 2003) ("Therefore, the district court erred when it stated that under both direct and circumstantial evidence methods of proof, [the plaintiff] must 'show that his age was a determining factor in his termination.' To the contrary, under the direct evidence approach, the [defendant] must show a legitimate reason for terminating [the plaintiff]'s employment that was not related to his age."). But this is admittedly difficult to keep in mind when no less of an authority than the Sixth Circuit has expressly (but, alas, imprecisely and confusingly) described a direct-evidence theory as distinguishable from an indirect-evidence (*McDonnell Douglas*) theory on the ground that the latter (and only the latter) is a "burden-shifting theory." *See Briggs v. Potter*, 463 F.3d 507, 514 (6th Cir. 2006).

Italian-Americans like the plaintiff, to be direct evidence in part because they were made three weeks before the plaintiff's termination), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). And notably in this context, a remark is ambiguous if it is subject to be interpreted in a benign, non-discriminatory way. *See Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 55 (1st Cir. 2021).

Having delved somewhat into the specifics as to what does (and does not) constitute direct evidence to support a claim of discrimination or retaliation, the Court now returns to a more general observation about direct evidence, one that seems frequently forgotten. This vital principle is that direct evidence is a very narrow concept. "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). Perhaps a statement could constitute direct evidence if the employer is *slightly* less express about the fact that it is acting on discriminatory animus, but the statement needs to be rather express in this regard in order to constitute direct evidence; "[d]irect evidence of discrimination is the equivalent of an employer stating, 'I fired you because you are [in a protected class].'" *Anthony v. Unite Tele. Co. of Ohio*, 277 F. Supp. 2d 763, 773 (N.D. Ohio 2002) (citing *Smith*, 155 F.3d at 805). Just as the concept of direct evidence is narrow, its applicability will be rare because generally words will not come "from lips of the defendant proclaiming his or her . . . animus," *Robinson v. Runyon*, 149 F.3d 507, 512–14 (6th Cir. 1998), or (even more to the point) from an employer "announc[ing] that [it is] acting on prohibited grounds." *Erwin*, 79 F. App'x at 896–97.

This leaves one final and critical question: does a defendant-movant bear an initial burden to show preliminarily that there is no direct evidence of discrimination on a particular claim, failing which the plaintiff has no burden to show the existence of any direct evidence to support such

claim and may take the claim to trial on the grounds that the defendant-movant failed to remove a genuine issue as to the existence of direct evidence? Or, to put the question conversely, is the burden on the plaintiff from the outset to show the existence of direct evidence (if in fact the plaintiff relies on direct evidence)? In truth, the undersigned could see this question going either way.

On the one hand, this approach arguably is consistent with the overall approach of Rule 56, *Celotex*, and its progeny. And despite superficial reasons to believe otherwise, this approach is not unfairly onerous in the sense that it asks the defendant-movant to prove a negative; under Rule 56 and case law decided thereunder, the defendant-movant need not *prove* that there is no direct evidence of discrimination, but rather need only point to some evidence preliminarily tending to indicate that this is the case. On the other hand, arguably a defendant who at least meets an initial burden with respect to an indirect-evidence theory of discrimination—which, after all, is the primary theory because (as noted above) direct evidence is rare—should be deemed to have met its initial Rule 56 burden with respect to plaintiff's claim as a whole, without having to account for a theory that statistically is unlikely to be implicated anyway. In this sense, arguably it should be the plaintiff who must raise the generally far-fetched possibility that the case involves direct evidence if in fact the plaintiff relies on this possibility at the summary-judgment stage. And despite substantial searching, the Court was unable to find any cases in which the court made it a point to ensure that the defendant-movant met an initial burden before looking to see whether the plaintiff could point to some direct evidence; instead, from what their opinions indicate, courts generally start by asking whether the plaintiff has identified anything that constitutes direct evidence. And this Court will do likewise.

Thus, because Plaintiff in this case asserts the existence of direct evidence, the Court will assess the validity of the assertion without asking first whether Defendant shifted the burden to Plaintiffs as to the existence of direct evidence.

<u>DISCUSSION</u>

As an initial matter, the Court first notes that it understands Defendant's Motion to request summary judgment as to all of Plaintiff's remaining claims (Counts) in her (operative) Second Amended Complaint (Doc. No. 104, "SAC").[25] Those claims are: Count I and Count II of the SAC, bringing claims for sex discrimination (based on the denial of tenure for Plaintiff in 2016 and 2019) and retaliation (based on the assignment to Plaintiff of a report (discussed below) and the denial of tenure for Plaintiff in 2019) under Title VII and Section 1981; and Count III and Count IV of the SAC—bringing claims for sex discrimination (based on the denial of Plaintiff's tenure in 2016 and 2019) and retaliation (in connection with the assignment to Plaintiff of a report (discussed below) and the denial of tenure for Plaintiff in 2019) under the THRA.

The Court notes that although the SAC states that Count I and Count II are based on "violation[s] of federal law," the SAC does not name a particular (federal) statute on which Count I and Count II are based. (Doc. No. 104 at ¶ 34). Elsewhere in the SAC, Plaintiff indicates that the action arises under "Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. §2000e et seq. (as amended), 42 U.S.C. §2000e-2 (as amended) and the Civil Rights Act of 1991, 42 U.S.C. §1981a," (*Id.* at ¶ 3), and so the Court discerns Count I and Count II to be brought under both Title VII and Section 1981. Ultimately, as noted in a footnote above, the legal framework applicable to Title VII (discussed at length above) is also applicable to Section 1981 and THRA claims. *See Smith*, 2024 WL 2097102, at *7 n. 26. *See also Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31

---

[25] The filing at Docket No. 104 is a redacted version of the SAC. Plaintiff has also filed a version of the SAC under seal at Docket No. 160. For obvious reasons, the Court will cite to the redacted version herein.

(Tenn. 1996) ("The stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act." (internal citations omitted)).[26] In other words, the Court will conduct only one analysis of each type of claim (that is, sex discrimination and retaliation) regardless of the statute (Title VII, Section 1981, and THRA) Plaintiff invokes.

In practice (and as suggested by the discussion above detailing the direct and indirect-evidence frameworks) there are several separate analyses that the Court must conduct herein when examining Defendant's Motion and Plaintiff's claims. First, the Court must consider Plaintiff's sex discrimination claims grounded on (purported) discrimination against her on the basis of sex when Plaintiff was denied tenure in 2016 and 2019 within the direct-evidence framework (if, of course Plaintiff *has* brought direct evidence of discrimination). Second, the Court must consider Plaintiff's retaliation claims within the direct-evidence framework (again, only if Plaintiff *has* brought direct evidence of retaliation). Third, the Court must consider Plaintiff's sex discrimination claims grounded on (purported) discrimination against her on the basis of sex when Plaintiff was denied tenure in 2016 and 2019 within the indirect-evidence framework. Fourth and finally, the Court must consider Plaintiff's retaliation claims within the indirect-evidence framework. Below (after first examining the undisputed facts underlying this action) the Court will examine the legal frameworks underpinning each of these analyses before analyzing the parties' arguments and applying the law.

---

[26] It is true that the THRA is broader than Title VII in some respects, *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *5 (M.D. Tenn. Apr. 2, 2020), but not any that are relevant to the analysis in this case.

Turning to Defendant's Motion, Defendant moves for summary judgment as to all of Plaintiff's claims, contending that "there is no direct or indirect evidence supporting either" of Plaintiff's claims "that her denial of tenure was based on sex or that she was subject to retaliation." (Doc. No. 465 at 1). Defendant further contends that "[e]ven if Plaintiff could show that she was denied tenure based on her sex or in retaliation for her 2016 grievance—both of which she cannot—the uncontroverted evidence demonstrates that Vanderbilt had a legitimate, non-discriminatory, non-retaliatory reason for denying her tenure: the decision-makers at multiple levels of her review sincerely believed that her research did not meet Vanderbilt's standard of excellence." (*Id.* at 3). Defendant also argues that "even if Plaintiff could make a prima facie case of sex discrimination or retaliation—which she cannot—she still cannot demonstrate that Vanderbilt's reasons for denying her promotion were pretextual." (*Id.*). Plaintiff naturally takes issue (though unavailingly, as will be explained below) with each of these arguments.

## I.    Undisputed Facts

Naturally, the ability of Plaintiff's claims to survive the Motion turns largely on what facts the Court should treat as not in genuine dispute (and thus as effectively established for purposes of the Motion); those facts are laid out in the following paragraphs.

Plaintiff, in her Undisputed Material Facts Response (Doc. No. 492) to Defendant's Undisputed Material Facts (Doc. No. 467) admits that numerous facts are undisputed for purposes of summary judgment.[27] Those facts, and Defendant's citations in support of them, are set forth

---

[27] That is not to say that Plaintiff admits the *materiality* of all of these facts; Plaintiff expressly disputes the materiality of several of them.

below verbatim[28] (albeit with an enumeration different than the enumeration in Defendant's Undisputed Material Facts and with certain citations tweaked):

1. Vanderbilt is an independent, privately supported, not-for-profit university chartered under the laws of the State of Tennessee. Exh. 2, ¶ 2 (Declaration of John Geer ("Geer Decl.")).

2. The standards for the appointment and promotion of faculty members at Vanderbilt, including the standards for review, approval, and appeal of tenure recommendations, are set forth in the Faculty Manual. Exh. 16 at 2 (Letter from Dean Richard McCarty to Mireille Lee (April 14, 2008) ("2008 Appointment Letter"); Exh. 10 (Vanderbilt University Faculty Manual (August 3, 2015, version)) (the "2015 Faculty Manual"); Exh. 11; (Vanderbilt University Faculty Manual (September 18, 2018, version)) (the "2018 Faculty Manual") (together, "Faculty Manual"); Exh. 1, ¶ 12 (George Decl.); Exh. 2, ¶ 11 (Geer Decl.).

3. With respect to the College of Arts and Science (the "College"), the criteria for tenure and promotion in the Faculty Manual are elaborated in the "Rules and Procedures for Faculty Appointments, Renewals, Promotions and Tenure in the College of Arts and Science, Vanderbilt University" (the "College Rules"). Exh. 1, ¶ 20 (George Decl.); Exh. 2, ¶ 12 (Geer Decl.); *see generally* Exh. 12 (College Rules (Sept. 11, 2018) ("2018 College Rules").

4. Each year, the College issues a document entitled, "Guidelines and Call for Recommendations for Promotions and Reappointments" (the "Guidelines"), which provides additional guidance on the tenure review process. Exh. 13 (Guidelines and Call (April 2015)); Exh. 14 (Guidelines and Call (May 2016)); Exh. 15 (Guidelines and Call (April 2018)) (together, the "Guidelines") ; Exh. 1, ¶ 20 (George Decl.); Exh. 2, ¶ 12 (Geer Decl.); Exh. 36 (Geer Dep.) at 92:13-93:24.

5. For the award of tenure, Vanderbilt requires: "(1) excellence in research, scholarship, or creative expression in one's discipline; (2) high level of effectiveness in teaching; and (3) satisfactory performance in the area of service." Exh. 10 at 27; Exh. 11 at 26 (Faculty Manual); Exh. 1, ¶ 13 (George Decl.); Exh. 2¸ ¶ 13 (Geer Decl.); Exh. 36 at 16:1- 17:16, 22:13-23:2, 35:13-37:11 (Geer Dep.) (discussing how Vanderbilt measures excellence in research).

6. Vanderbilt relies on external review letters for their substantive comments, not just for a positive or negative recommendation regarding tenure. Exh. 1, ¶¶ 10-11 (George Decl.); Exh. 2, ¶¶ 9-10 (Geer Decl.); Exh. 13 at 7 (2015 College Rules); Exh. 15 at 7 (2018 College Rules); Exh. 36 at 16:1-13; 17:17-20:3 (Geer Dep.).

7. In 2008, Plaintiff was hired as a tenure track Professor in the Department of Art and Architecture (the "Department") in the College of Arts and Science (the "College"). Exh. 16 at 1-2 (Ltr. from Dean Richard McCarty to Mireille Lee (Apr. 24, 2008)) ("2008 Appointment Letter").

8. Plaintiff's employment at Vanderbilt, as a Professor was governed by the Faculty Manual and the College Rules in effect at the time. *Id.* at 2.

---

[28] The Court notes here that the citations within Defendant's Undisputed Material Facts refer throughout to "Exhibits" or "Exhs." These are the exhibits to Defendant's Undisputed Material Facts which may be found as the attachments titled with a corresponding exhibit number (some in redacted form) to the filings at Docket Nos. 467-472.

9. Plaintiff applied for promotion and tenure at Vanderbilt in 2015. Exh. 30 at 1 (2015 Lee Tenure Committee Review Mtg. Minutes)(Oct. 12, 2015)) ("2015 Dept. Minutes"); Exh. 31 at 1 (Ltr. from Professor Murphy to Dean Benton (Oct. 28, 2015)) ("2015 Dept. Chair Letter"); Exh. 40 at 5 (2017 Grievance Report); Exh. 18 at 185:10-13 (M. Lee Dep.).

10. After a multitiered review process, Plaintiff was denied promotion and tenure in 2016. Exh. 18 at 25:12-21 (M. Lee Dep.); Exh. 40 at 5 (2017 Grievance Report).

11. A 5-2 majority of Vanderbilt's university-wide Promotion and Tenure Review Committee ("PTRC") voted against awarding Plaintiff promotion and tenure in 2016. Exh. 34 at 1 (PTRC Report) (reporting that Plaintiff "was not recommended for the award of tenure (two in favor of tenure and five opposed)").

12. The PTRC recommended against promotion and tenure in 2016 because it concluded that Plaintiff did not meet Vanderbilt's standard of excellence in research. Exh. 34 at 2 (PTRC Report) (reporting that "[a] majority of the PTRC concluded that [Plaintiff] does not meet the standard for excellence in research," and discussing concerns about the quantity and quality of Plaintiff's work); Exh. 1, ¶¶ 25-29, 34, and Ex. C (George Decl.); Exh. 35 at 21:7-17 (George Dep.) (". . . the PTRC looking closely at the content of the external letters to see whether the author's conclusions were justified and supported."); Exh. 66 at 40:5-42:23 (McCammon Dep.); Exh. 21 at 2-3 (2013 Ltr. from Dean Dever to Plaintiff) (cited in PTRC Report at 2); Exh. 18 at 185:14-186:13 (M. Lee Dep.) ("Q: And at this point, September 30, 2015, how far along were you on this project? A: I don't remember exactly. Q: Well, you list a number of chapters. Were any of them written? A: Not at the time I first went up for tenure."); *id.* at 47:17-22 ("Q. Are you aware that a robust majority of the PTRC found that you did not meet Vanderbilt's standards for excellence in research? A. It was a divided vote. Two people did vote for my receiving tenure . . .") Exh. 4, ¶ 11 (Murphy Decl.) ("At the time of [Plaintiff's] first tenure review, she had not published any articles in those flagship journals while employed at Vanderbilt."); Exh. 72 at 2 (. . . 2015 Rev. Ltr.) (finding it "more difficult to answer" whether Plaintiff's work was original and stating, "I did not find it overly bold or necessarily groundbreaking" and "I did not find the work overly pioneering."); Exh. 28 at 1 (. . . 2015 Rev. Ltr.) (finding, regarding BODY, DRESS, that, "[c]onclusions are sensible but unsurprising . . . The contribution, in short, is chiefly synthetic."); Exh. 29 at 1-2 (. . . Rev. Ltr.) (raising a number of concerns, including issues of "oversimplified summaries of complex issues," "factual errors," and key omissions).

13. The Provost agreed with the decision of the PTRC. Exh. 40 at 5 (Ad Hoc Grievance Committee Report (Apr. 11, 2017) ("2017 Grievance Report"); Exh. 41 at 1 (Provost Wente Mem. to Beverly Moran, Chair of Ad Hoc Grievance Committee) (Oct. 12, 2016) ("Wente Response to 2016 Grievance").

14. In 2016, Plaintiff submitted a grievance against Department Chair Murphy, Provost Wente, and the PTRC, alleging that Vanderbilt's standards for tenure had been "subjectively and unfairly applied" in her case "as a result of personal bias" and discrimination. Exh. 42 at 1 (Letter from Mireille Lee to Beverly Moran Submitting Grievance (July 13, 2016) ("2016 Grievance")); Exh. 40 at 2.

15. The 2016 Grievance Committee recommended that Plaintiff should receive three additional years on her probationary period and ben allowed to apply for tenure again during the 2018-2019 academic year because she had been eligible for parental leave and might have negotiated to take it if someone at Vanderbilt had "made [her] aware" of Vanderbilt's parental leave policy. [Exh. 40] at 9-11.

16. Plaintiff applied for tenure and promotion in 2018. Exh. 55 at 1 (2018 Dept. Minutes); Exh. 56 at 1, 6 (2018 Dept. Chair Ltr.); Exh. 59 at 1 (Geer Mem.); Exh. 18 at 190:23- 191:10 (M. Lee Dep.) (acknowledging that Plaintiff came up for tenure in fall 2018).

17. After a multitiered review process, Plaintiff was denied promotion and tenure in 2019. Exh. 59 at 1 (Geer Mem.); Exh. 37 at 4-5 (2021 Grievance Report); Exh. 18 at 25:12-16 (M. Lee Dep.).

18. The tenured faculty members in the Department voted 4-3 in favor of tenure. Exh. 55 at 7 (2018 Dept. Minutes); Exh. 3, ¶ 26 (Robinson Decl.).

19. In 2019, Dean John Geer determined that Plaintiff's record of research did not meet Vanderbilt's standard of excellence. Exh. 59 at 1-5 (Geer Mem.); Exh. 2, ¶ 29, 32-33 (Geer Decl.) ("After my careful analysis, I determined that neither the quantity nor quality of Professor Lee's scholarly work justified an award of tenure. In my professional opinion, her scholarship fell short of Vanderbilt's standard of excellence."); Exh. 36 at 41:11-42:23 (Geer Dep.) (explaining that Plaintiff's work "doesn't have that theoretical contribution, analytical contribution that makes it really distinctive, that makes it truly, truly excellent"); *id.* at 43:12-44:7; 44:18-45:5 ("There was, you know, a strong theme of this work being descriptive, being synthetic, being a contribution, but not making the kind of theoretical, analytical contribution that we expect at Vanderbilt."); *id.* at 45:24-47:10, 57:10-18, 58:11- 18, 59:18-60:1, 62:20-64:22, 68:2-69:13, 69:24- 71:2, 74:21-76:18, 85:10-86:14, 90:6- 91:16, 100:3-101:16, 120:2-122:4.

20. Under the Faculty Manual, a department's recommendation for tenure moves forward only with the concurrence of the dean, except when the department appeals the Dean's nonconcurrence by a vote of at least two-thirds of the department's tenured faculty. Exh. 11 at 28 (2018 Faculty Manual).

21. The Department voted unanimously not to appeal Dean Geer's decision based on their review of Plaintiff's tenure file in light of the reasoning in Dean Geer's memorandum. Exh. 61 at 1 (Email from Robinson to Dean Geer (Mar. 13, 2019)) ("Robinson Email"); Exh. 3, ¶ 26 (Robinson Decl.) ("Given the comprehensiveness of Dean Geer's memorandum, together with the fact that the Department's original vote had been a close 4-3 in favor of tenure, and the need for a two-thirds majority to appeal, the Department voted unanimously not to appeal the decision."); *id.*, ¶¶ 15-20 (Robinson Decl.) ("Department faculty also expressed their own concerns regarding [Plaintiff's] scholarship, including that her book is descriptive in nature, that [Plaintiff's] use of feminist theory is simplistic, that the book refers to theory rather than applying it, and that it is frustrating for its lack of intellectual sophistication."); *id.*, ¶ 22 ("[T]here was not discussion of the grievance that she had filed back in 2016 concerning her prior tenure review."); Exh. 4, ¶¶ 19-20 (Murphy Decl.) ("I did not feel upset or angry that [Plaintiff] had filed a grievance or that she had named me as a respondent . . . I never heard any colleagues in the Department mention that they were upset or angry about [Plaintiff's] 2016 grievance."); *id.*, ¶¶ 23-27 (Murphy supported Plaintiff's application for promotion and tenure, including offering her special funds to edit a polished chapter of her second book, making her aware of her eligibility for sabbatical and assisting in her application for it, making it possible for Plaintiff to teach classes she had already taught so that she could devote time to research, and sparing Plaintiff from many departmental service duties); Exh. 18 at 107:9-109:20 (M. Lee Dep.) (admitting several ways that Professor Murphy supported Plaintiff both before and after her grievance); *id.* at 128:2-131:8 (admitting that Vivien Fryd was a "friendly and supportive

colleague" to Plaintiff before and after her grievance); *id.* at 132:23-134:16 (admitting no knowledge or evidence of why Vivien Fryd voted against tenure in 2018); *id.* at 213:13-214:8; Exh. 4, ¶ 40 (Murphy Decl.) ("Even though I had twice supported [Plaintiff's] applications for tenure, I voted not to appeal because I thought doing so would be futile. There were clear weaknesses in her file, and she had been denied tenure twice. Neither her prior grievance nor her sex had anything to do with my position on this issue.").

22. From 2007-2021, six tenure track faculty members have been hired into the Department: five women and one man. Exh. 1, ¶¶ 37-39, Ex. G (George Decl.).

23. From 2017 to 2021 four women on the tenure track in the Department received tenure. Exh. 1, ¶¶ 37-39, Ex. G (George Decl.).

24. From 2017 to 2012, the one man on the tenure track in the Department was not reappointed after an interim review in 2020 and never proceeded to the tenure review process at Vanderbilt. Exh. 1, ¶¶ 37-39, Ex. G (George Decl.); Exh. 18 at 30:8-16 (M. Lee Dep.) (admitting that no male faculty members had recently received tenure in the Department and no male spousal hires in the Department); *id.* at 106:3-22 (Plaintiff took the office of a male faculty member after he did not pass his fourth-year review).

(Doc. No. 467).[29] Although Plaintiff concedes that these 24 enumerated facts are undisputed (at least for the purposes of Defendant's Motion), Plaintiff disputes seven purported facts—the ones stated in paragraphs 13, 15, 17, 23, 25, 27, and 28—set forth in Defendant's Undisputed Material Facts. The Court will address each of these facts below but will first make one observation. In the Undisputed Material Facts Response, Plaintiff does not cite directly to the *record* on the docket even once. Rather, even in those (limited) instances where Plaintiff cites some source(s) to support her assertion that a purported fact is disputed, her citations are not geared to the record. For example, she cites "Geer depo.," or "McCammon depo." or cites what appear to be bates numbers, without giving any indication of where these documents are in the record on the docket. As an initial matter, this is in plain violation of 2020 Local Rule 56.01(c)(3) (the version of the Local Rules, as noted above, that was in effect when briefing on the Motion occurred) which provides that a response to a statement of fact asserting that a fact is disputed "must be supported by a citation *to the record*." 2020 LR 56.01(c)(3) (emphasis added). Nevertheless, the Court has

---

[29] With respect to certain facts listed above, Plaintiff concedes that they are undisputed but attempts to provide additional context with respect to these facts. (Doc. No. 492 at ¶¶ 12, 20, 21, 26). The Court notes for clarity that it is treating these facts as undisputed for the purposes of the instant Motion.

endeavored (via a not insignificant expenditure of scarce judicial resources) to discern what documents Plaintiff was referencing and where (if indeed anywhere) they exist in the record. The Court notes below instances in which it was unable to determine the identity of a document that Plaintiff was referencing.

First, Plaintiff disputes the fact elucidated in paragraph 13 of Defendant's Undisputed Material Facts, which states:

> The PTRC did not consider Plaintiff's sex in making its decision. Exh. 34 at 1- 3 (PTRC Report) (omitting any mention of Plaintiff's sex in connection with its decision to deny tenure); Exh. 1, ¶ 24 (George Decl.) ("Nothing outside of the file was considered. There was no discussion among the PTRC members about Professor Lee's sex or the fact her spouse was also employed by Vanderbilt."); Exh. 35 at 31:1-19 (George Dep.); Exh. 66 at 22:22-23:3 (McCammon Dep.); Exh. 67 at 20:23-21:14 (Posavac Dep.).

(Doc. No. 467 at ¶ 13). Plaintiff disputes[30] the fact in paragraph 13[31] because (according to Plaintiff) "Plaintiff's gender is clear from her name." (Doc. No. 492 at 3). This will not do. First, Plaintiff makes no citation to the record in support of her assertion.[32] Second, even making the dubious assumption[33] that "Plaintiff's gender is clear from her name"—i.e., that it would be self-

---

[30] The Court herein notes when Plaintiff disputes an asserted fact, but the Court in making such a notation does not necessarily mean that the *dispute* is *genuine*. Naturally, whether a fact is in genuine dispute is exactly what matters when considering a motion for summary judgment. Fed. R. Civ. P. 56(a); 2020 LR 56.01(b).

[31] Throughout the Undisputed Material Facts Response, Plaintiff used the term "denied" to refer to purported facts that she disputes.

[32] This appears to be a consistent problem for Plaintiff and is in direct contravention of 2020 Local Rule 56.01(c)(3), which, as noted above, requires a non-movant disputing a fact for the purposes of summary judgment to do so with a "specific citation to the record."

[33] The Court feels justified calling such an assumption dubious in part because information on the Internet supports the undersigned's impression that it is extremely rare for babies to be named "Mireille" in the United States and that male babies have been known (albeit very rarely) to be named "Mireille." But to the extent that someone might complain (fairly enough) that the Court should not rely on such Internet sources on this motion for summary judgment, the Court notes that these sources ultimately play no role in the Court's decision. The problem here is not that the assumption is dubious (as suggested in part by Internet

evident to persons in the United States that someone named "Mireille" necessarily would be female—this does not actually address the fact asserted in paragraph 13, which is that "[t]he PTRC did not consider Plaintiff's sex in making its decision." (Doc. No. 467 at ¶ 13).[34] In other words, Plaintiff's assertion that this fact is in dispute is exactly the kind of "contrived" "dispute of fact" that the Sixth Circuit has noted is not genuine for the purposes of summary judgment. *See Brown v. Lexington-Fayette Urb. Cnty. Gov't*, 549 F. App'x 366, 372 (6th Cir. 2013). Accordingly, the Court treats the fact in paragraph 13 as not in genuine dispute.

Next, Plaintiff disputes the factual assertion in paragraph 15 of Defendant's Undisputed Material Facts, which states:

> The PTRC followed Vanderbilt's applicable procedures in evaluating Plaintiff's tenure file and reaching a decision. Exh 71 at 17 (Mem. & Final Order, Cross Mots. for Summary Judgment, Lee v. Vanderbilt Univ., No. 22-0621-I, at 17 (Apr. 1, 2024)) ("Chancery Decision"); Exh. 8, Ex. 1 at 29 (B. Lee Report) ("I believe that the individuals involved in Professor Mireille Lee's 2015-16 and 2018-19 tenure reviews followed the policies in the 2015 and 2018 editions of the Faculty Manual and College of Arts and Science documents regarding reviewing candidates for promotion and tenure."); *id.* at 18-20 ("In my opinion, the individuals involved in both negative tenure decisions followed the required procedures, appropriately reviewed the evidence provided, and made decisions using their academic judgment concerning whether [Plaintiff] met the criteria for promotion and tenure."); Exh. 40 at 6-8 (2017 Grievance Report).

 (Doc. No. 467 at ¶ 15). Plaintiff disputes this fact because (according to Plaintiff) "[t]he procedure [for evaluating Plaintiff's tenure file] requires only consideration of [that] file." (Doc. No. 492 at 3) (citing McCammon depo., p. 23).[35] Plaintiff' s suggestion here (although difficult for the Court

---

sources), but rather that Plaintiff actually should rely here on something better than an assumption and that the assumption ultimately does not help Plaintiff even if it is accepted as valid.

[34] If paragraph 13 had instead asserted that the PTRC did not *know* Plaintiff's gender, perhaps the fact asserted therein would be in genuine dispute.

[35] Plaintiff cites to the "McCammon depo." and so the Court follows Plaintiff's style when describing what she is citing here. Frustratingly, Plaintiff did not indicate where this document (or numerous other references she makes in her Undisputed Material Facts Response) is located in the record. For context, the Court notes

to parse) seems to be that the PTRC considered improperly a particular memorandum (Doc. No. 187-1 at 13, "Benton depo. Ex. 5") in its decision on whether to grant or deny Plaintiff tenure. (Doc. No. 492 at 3) (citing Benton depo., pp. 44-48).[36] Yet, the deposition testimony cited by Plaintiff neither shows (even arguably) that it either would have been improper for the PTRC to consider that memorandum or that the PTRC did in fact consider that memorandum; in other words, it is indicated in the deposition testimony relied on by Plaintiff neither that the memorandum was relied on by anyone in the PTRC nor that such reliance would have been improper. Accordingly, the Court treats the fact in paragraph 15 as not in genuine dispute.[37]

Next, Plaintiff disputes the fact asserted in paragraph 17 of Defendant's Undisputed Material Facts, namely:

> The 2016 Grievance Committee did not find any procedural errors or discrimination in connection with Plaintiff's 2015-2016 tenure review. Exh. 40 at 6-8 (2017 Grievance Report).

(Doc. No. 467 at ¶ 17). Plaintiff disputes this fact by relying on the deposition of Beverly Moran (pointing the Court particularly to page 83 of the deposition transcript of Beverly Moran).[38] (Doc.

---

that it appears that the relevant "McCammon depo." excerpt may be found (under seal) at Docket No. 192-1.

[36] As above, Plaintiff refers to this deposition as the "Benton depo." and so the Court follows Plaintiff's lead when describing what she is citing here. Again, Plaintiff does not indicate on the docket where this record is located. For context, the Court notes that the relevant Benton deposition excerpt may be found at Docket No. 498-11.

[37] Ultimately, Plaintiff invokes these (purported) procedural deficiencies only in an attempt to show that Defendant provided a pretextual reason for denying Plaintiff tenure. (Doc. No. 494 at 21-24).

  Additionally, although Plaintiff cites the "Faculty Manual" when disputing this fact, she does not specify what version (e.g., 2015, 2018 or otherwise) she is referring to and so the Court cannot rely on the Faculty Manual to determine whether this fact is in genuine dispute and instead relies solely on the Plaintiff's cited evidence that it was able to identify with some certainty in the record.

[38] The relevant deposition excerpts, which Plaintiff refers to as the "Moran depo.," may be found (it appears to the Court) at Docket No. 195-1 under seal.

No. 492 at 4). Yet, the only error identified by Moran (who was the chair of the 2016 Grievance Committee (Doc. No. 470-10)) was related to the amount of time Plaintiff was given to attain tenure, *not* to the 2015-2016 *tenure review process itself*. Accordingly, the Court will treat this fact as not in genuine dispute.

Next, Plaintiff disputes the fact asserted in paragraph 23 of Defendant's Undisputed Material Facts, which provides:

> Dean Geer did not consider Plaintiff's sex in deciding not to concur in the Department's recommendation that Plaintiff be awarded tenure and promotion. Exh. 59 at 1-7 (Geer Mem.); Exh. 2, ¶ 27 ("I did not consider Professor Lee's sex in evaluating her file. Nor did I consider the fact that her spouse was on the faculty."); *id.*, ¶ 24 (Department's recommendation "did not include any discussion of her sex or the term 'spousal hire.'"); Exh. 55 (Nov. 2, 2018, meeting summary) (omitting any mention of Plaintiff's sex in connection with the decision to support tenure by a vote of 4-3); Exh. 3, ¶ 22 (finding no irregularities in Department's process and "no discussion of Lee's sex") (Robinson Decl.); Exh. 50, ¶ 16 (no discussion of "Dr. Lee's gender" by Ad Hoc Committee). Exh. 6, ¶ 47 (Fryd Decl.) (confirming that Plaintiff's sex was not a factor in the Department's decision); Exh. 18 at 30:3-7 (M. Lee Dep.) (admitting that Dean Geer never made any sexist remarks to Plaintiff or said anything derogatory to her about female spousal hires); *id.* at 72:25-73:25 (admitting that nothing in Dean Geer's memorandum refers to Plaintiff's gender or her status as a spousal hire); *id.* at 88:15-89:5 (admitting that her contention that Vanderbilt treated female spousal hires less favorably than male spousal hires was merely "a feeling [she] got," a "bit of a sense" that was "more tacet [sic] than anything else"); *id.* at 29:21-30:3 (admitting no personal knowledge to suggest that Plaintiff's sex or spousal hire status affected Dean Geer's evaluation of her tenure file); Exh. 8, Ex. 1 at 18, 20-22 (B. Lee Report).

(Doc. No. 467 at ¶ 23). In disputing this fact, Plaintiff asserts that "Plaintiff Lee met with Dean Geer so he was aware that she was female," (Doc. No. 492 at 5), and cites the following document: "EEO Interviews, VU 3425." (Doc. No. 492 at 5).[39] This will not do; as before, Plaintiff's assertion does not actually address the fact asserted—here, the fact asserted in paragraph 23 is that "Dean Geer did not consider Plaintiff's sex in deciding not to concur in the Department's

---

[39] The EEO Interviews apparently referenced by Plaintiff are (under seal) at Docket No. 428-2.

recommendation that Plaintiff be awarded tenure and promotion." (Doc. No. 467 at ¶ 23).[40] Accordingly, the Court will treat the fact in paragraph 23 as not in genuine dispute.

Next, Plaintiff disputes the fact in paragraph 25 of Defendant's Undisputed Material Facts. Paragraph 25 asserts that:

> Dean Geer did not consider Plaintiff's 2016 grievance in making his decision. Exh. 2, ¶ 28 (Geer Decl.) ("I also did not consider the fact that Professor Le had filed an internal grievance regarding her prior tenure application."); *id.*, ¶ 8 ("Nor was I a target of, or a witness in, the grievance Professor Lee filed regarding her 2016 tenure denial. Indeed, I do not recall being aware of that grievance at all prior to this litigation."); *id.*, ¶ 7 (Geer Decl.) ("In the spring of 2016, I was not a member of the PTRC"; explaining an error in the EEOO Investigative Report); Exh. 1, ¶¶ 6-8 (George Decl.) (John Geer was not a member of the PTRC in spring 2016); Exh. 36 at 20:4- 21 (Geer Dep.) ("As an ex officio [of the PTRC], I basically was there to ensure process was followed. I was not there as a voting member or as somebody who made substantive contributions to the evaluation of the [tenure] file."); Exh. 35 at 21:22-22:16 (George Dep.) ("John Geer would not have voted at this [PTRC] meeting. He wasn't a member of the PTRC."). Exh. 3, ¶ 22 (Robinson Decl.) ("Overall, I did not observe any irregularities—let alone discrimination or retaliation—in [Plaintiff's] tenure review processes.").

(Doc. No. 467 at ¶ 25). In disputing this fact, Plaintiff asserts that "[Dean] Geer was a Respondent [of the 2016 grievance] as a member of the PTRC. (EEO Interviews, VU 3426) and worked for the Provost, another Respondent [of the 2016 grievance]." (Doc. No. 492 at 5).[41] Plaintiff's assertion here is unavailing. Plaintiff makes no effort to show how her assertion supports finding that the fact in paragraph 25 is in genuine dispute; though she states that Dean Geer was a member of the PTRC, was a respondent to the 2016 grievance, and worked for a respondent to the 2016 grievance, Plaintiff makes no affirmative argument to show that Dean Geer actually *considered* Plaintiff's 2016 grievance in making his tenure decision, and the Court will not contort itself to

---

[40] If paragraph 23 had instead asserted that the Dean Geer did not *know* Plaintiff's sex, perhaps the fact asserted therein would be in genuine dispute.

[41] As above, the EEO Interviews apparently referenced by Plaintiff are (under seal) at Docket No. 428-2.

make Plaintiff's argument for her. Accordingly, the Court concludes that the fact in paragraph 25 is not in genuine dispute. *See Thompson I.G., LLC v. Edgetech I.G., Inc.*, 590 F. App'x 532, 537 (6th Cir. 2014) ("The nonmoving party cannot create a genuine dispute of material fact through mere speculation, conjecture, or fantasy.") (internal citations omitted); *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) ("party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences" (citations omitted)).

Next, Plaintiff disputes the fact in paragraph 27 of Defendant's Undisputed Material Facts. Paragraph 27 asserts that:

> Dean Geer would have recommended against tenure in Plaintiff's case even if it included the more typical unanimous endorsement from the Department's tenured faculty. Exh. 2, ¶¶ 33-34 (Geer Decl.) ("I would have had concerns about [Plaintiff's] file even if it included the more typical unanimous endorsement from the Department's tenured faculty . . . I have recommended against tenure or promotion in other cases in which the candidate's department supported the application unanimously and would have done so in the case of [Plaintiff] as well."); *id.* at ¶ 26 ("I also conducted my own independent analysis of the entire file and discussed it with my associate deans. I considered all of Professor Lee's work at Vanderbilt from 2008 to 2018."); Exh. 5, ¶ 9 (Crawford Decl.) ("These understandable frustrations did not affect the work of the Committee, except perhaps to make us even more careful in approaching our work."); Exh. 35 at 34:1-11 (George Dep.) ("If there is a dissenting vote, that's a worry, when coming from a department. So, it's a red flag if there is a negative vote, even one negative vote at the faculty department level or school, in schools without department."); Exh. 7, ¶ 5 (Moodey Decl.) ("I was not the target of, or even aware of, any grievance [Plaintiff] filed following her 2016 tenure denial."); *id.*, ¶¶ 6-13 ("I voted against recommending [Plaintiff] for promotion and tenure because, based on my own review of [Plaintiff's] scholarship, I agreed with the critiques of her scholarship that appeared in the external review letters.").

(Doc. No. 467 at ¶ 27). Plaintiff disputes this fact by asserting that "Defendant Vanderbilt admitted that Plaintiff's tenure file was stronger in 2018. (Vanderbilt letter to EEOC dated May 1, 2020, p. 6). The dean recommended tenure and promotion in 2016. (Benton depo., ex. 2)." (Doc. No. 492

at 5).[42] This will not do; Plaintiff asks the Court to speculate that Dean Geer would have recommended tenure in 2019 because another dean (Dean Benton) had previously recommended tenure for Plaintiff in the 2015-2016 tenure review process. This sort of speculation is unavailing, *see Brown*, 549 F. App'x at 372 ("Speculation alone cannot create a genuine issue of material fact sufficient to resist summary judgment"), and accordingly the Court will treat the fact at paragraph 27 as not in genuine dispute.

Finally, Plaintiff disputes the fact in paragraph 28 of Defendant's Undisputed Material Facts. Paragraph 28 asserts that:

> Vanderbilt followed its tenure review procedures in denying Plaintiff's tenure application in 2019. Exh. 71 at 5 (Chancery Decision) (Plaintiff admitted that Vanderbilt's tenure review policies and procedures are reasonable); *id.* at 19 (finding that Vanderbilt followed its tenure review procedures in Plaintiff's 2018-19 tenure reviews); *id.* ("Vanderbilt has met its burden of negating an essential element of [Plaintiff's] breach of contract claim or showing that her evidence is insufficient to establish a substantial departure from Vanderbilt's tenure review process under the Faculty Manual or from accepted academic norms."); Exh. 8, Ex. 1 at 29 (B. Lee Report) ("I also believe . . . that the processes and policies used to make promotion and tenure decisions at Vanderbilt are fair, reasonable, and consistent with good practice at institutions similar to Vanderbilt throughout the United States."); *See* Exh. 37 at 3-6 (2021 Grievance Report) (after investigation, rejecting Plaintiff's allegations of pretext); Exh. 64 at 32-34 (EEOO Inv. Report) (after investigation, finding no evidence of pretext). Exh. 59 at 1-5 (Geer Mem.); Exh. 50 at 1-8 (Ad Hoc Committee Report); Exh. 55 at 2-7 (2018 Dept. Minutes); Exh. 57 at 1 (SARC Mem.); Exh. 44 at 3-5 (M. Lee 2018 CV); Exh. 53 at 3 (Gawlinski Rev.) ("The accessibility of the book occasionally means that breadth trumps depth."); Exh. 54 at 1-2 (Junker Rev.) (critiquing BODY, DRESS as a "companion," stating that it "does not . . . provide the foundation for the development of a new fully fledged theoretical approach" and that Plaintiff presents "a challenging idea but again, without a detailed reasoning."); Exh. 73 at 2 (. . . 2018 Ltr.) (stating that he "did not find it overly bold or necessarily groundbreaking"); Exh. 52 at 2 ( . . . Rev. Ltr.) (". . . as an end point [BODY, DRESS] disappoints"); *id.* at 5 ("Repeatedly she lists views and takes no side, takes

---

[42] Although the Court was able to locate the "Benton depo., ex. 2" in the record at Docket No. 187-1 (under seal), the Court was unable to locate the "Vanderbilt letter to EEOC May 1, 2020, p. 6" document that Plaintiff is referencing here. Even assuming that this latter document supports Plaintiff's assertion, it is unavailing for the reasons described above.

a side without explaining how one would argue for that position, or points to an argument without explaining why that argument is a good one.").

(Doc. No. 467 at ¶ 28). Plaintiff disputes this fact because (according to Plaintiff) "Vanderbilt penalized Lee for tenure clock extensions." (Doc. No. 492 at 5) (citing Saggi depo., p. 36; Dow depo., p, 101; Geer depo. ex. 1; Faculty Manual, p. 27).[43] Plaintiff does not specify or explain how Vanderbilt "penalized" Plaintiff or how "penalizing" Plaintiff for tenure clock extensions is somehow divergent from Vanderbilt's tenure review procedures. Instead, she makes unexplained citations to various portions of the record. This will not do. *See e.g., Crace v. Efaw*, No. 2:09-CV-551, 2011 WL 1459357, at *2 (S.D. Ohio Apr. 15, 2011) ("Instead, the non-moving party must support the assertion that a fact is genuinely disputed." (citations omitted) (internal quotation marks omitted)); *Small Hearts Daycare Ctr. II, LLC v. Quick*, No. 4:09-CV-2132 HEA, 2014 WL 186158, at *2 (E.D. Mo. Jan. 16, 2014) ("The nonmoving party must articulate and substantiate specific facts showing a genuine dispute of material fact."). Therefore, the Court will treat the fact in paragraph 28 as not in genuine dispute.

This means that all 31 facts in Defendant's Undisputed Material Facts will be treated as undisputed or not in genuine dispute by the Court for the purposes of the Motion.[44]

_____

[43] What Plaintiff refers to as the "Saggi depo." is found (in redacted form) at Docket No. 220-10. Likewise, the so-called "Dow depo." is found (under seal) at 190-1, and the so-called "Geer depo. ex. 1" is found (under seal) at 200-1. Plaintiff does not specify which version (i.e., 2015, 2018, or some other version) of the "Faculty Manual" she is referring to here, and so the Court is unable to determine whether the citation to the "Faculty Manual" supports Plaintiff's assertion.

[44] The Court is aware of the "Notice of Related Authority" (Doc. No. 625, "Notice"), filed by Defendant on February 17, 2026, which conveys updates regarding a related Tennessee state court proceeding ("State Court Proceeding") filed by Mirielle Lee against Vanderbilt University. Specifically, via the Notice, Defendant argues that "[t]he Tennessee Court of Appeals' holdings [(regarding Plaintiff's claims against Vanderbilt concerning (purported) breaches of her employment contract with Vanderbilt)] that Vanderbilt did not substantially depart from accepted academic norms and did not engage in procedural irregularity when it denied Plaintiff's applications for tenure are now final and enforceable [as a result of the Tennessee Supreme Court denying Plaintiff's application for permission to appeal the Tennessee Court of Appeals' decision to the Tennessee Supreme Court]. Thus, this Court must give the Appellate Court Decision the same preclusive effect that it would have in the state courts of Tennessee." (Doc. No. 625 at 3-4).

## II. Direct Evidence Framework

The Court will first examine Plaintiff's claims for sex discrimination and retaliation under the direct evidence framework. The Sixth Circuit has previously explained the respective burdens on the parties in the context of direct evidence (in a case dealing specifically with discrimination, but the same principles are applicable in a retaliation context) as follows:

> [A discrimination] plaintiff may support her claim with either direct evidence or indirect (also called circumstantial) evidence. *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998). We have defined direct evidence as "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir. 2004). When a plaintiff establishes discrimination through direct evidence, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *DiCarlo,* 358 F.3d at 415 (addressing national-origin-discrimination claim; quoting *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 382 (6th Cir. 2002)); *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S. Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion)); *see also DeBrow v. Century 21 Great Lakes, Inc.,* 260 Neb. 868, 620 N.W.2d 836, 838 (Mich. 2001) (per curiam) (when plaintiff offers direct evidence of discrimination, "the case should proceed as an ordinary civil matter" (citation omitted)).

*Blair*, 505 F.3d at 523-34 (6th Cir. 2007).

Leaving aside the direct evidence framework for the moment, the Court will first consider, as explained earlier by the Court herein, whether Plaintiff has in fact presented anything that constitutes direct evidence of either sex discrimination or retaliation. If not, the Court need go no further in analyzing Plaintiff's claims for sex discrimination (concerning the denial of Plaintiff's tenure in 2016 and 2019) and retaliation under a direct evidence framework. *See also Benitez v. Tyson Fresh Meats*, No. 3:18-CV-00491, 2022 WL 1283087, at *27 (M.D. Tenn. Apr. 28, 2022)

---

The Court has reviewed and considered the Notice and has determined that the Notice does not disturb the Cout's analysis or ultimate conclusion herein with respect to the Motion, particularly given that the Court has already determined, irrespective of the Notice, that all 31 facts in Defendant's Undisputed Material Facts will be treated as undisputed for the purposes of the instant Motion. The Court's eschewal of reliance on the Notice obviously does not ultimately prove detrimental to Defendant.

("[W]here Plaintiffs assert the existence of direct evidence, the Court will assess the validity of the assertion without asking first whether Defendant shifted the burden to Plaintiffs as to the existence of direct evidence.").

Although Plaintiff asserts in her Response that Vanderbilt "ignores" direct evidence in its Opening Brief,[45] (Doc. No. 494 at 16) Plaintiff never actually tells the Court what this direct evidence is. Instead, she vaguely alludes to the existence of purported direct evidence without any supporting citation to the record. (*Id.* at 2, 6, 16, 18).[46] In other words, Plaintiff has offered no direct evidence of sex discrimination or retaliation, and accordingly the Court will not consider

---

[45] Indeed, Defendant asserts persuasively in its Opening Brief and Reply that Plaintiff has uncovered no direct evidence of sex discrimination with respect to either her 2016 tenure denial (Doc. No. 466 at 23, Doc. No. 513 at 4-5), or her 2019 tenure denial (Doc. No. 466 at 27, Doc. No. 513 at 4-5). Defendant also asserts broadly in her Motion that Plaintiff has *no* direct evidence to support either her sex discrimination or retaliation claims. (Doc. No. 465 at 1-2). Indeed, Defendant makes these assertions with citations to the record and argues in relevant part in her Opening Brief that:

> Plaintiff lacks direct evidence that Vanderbilt subjected her to sex discrimination. Direct evidence is "evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kostic v. United Parcel Serv., Inc.*, 532 F. Supp. 3d 513, 527 (M.D. Tenn. 2021). Plaintiff admits that her contention that Vanderbilt treated female spousal hires less favorably than male spousal hires was merely "a feeling [she] got," a "bit of a sense" that was "more tacet [sic] than anything else." Exh. 18 at 88:15-89:4 (M. Lee Dep.). According to Plaintiff herself, no one told her that female spousal hires were treated less favorably, and no one in the position of making an employment decision at Vanderbilt said anything indicating that female spousal hires were disfavored. *Id.* Moreover, the PTRC memorandum does not mention Plaintiff's sex. *See* Exh. 34 (PTRC Report). None of the witnesses who served on the PTRC when it voted against awarding promotion and tenure testified that Plaintiff's sex was a factor in their decision. Exh. 35 at 31:1-19 (George Dep.); Exh. 66 at 22:22-23:3 (McCammon Dep.); Exh. 67 at 20:23-21:14 (Posavac Dep.). The PTRC did not discuss Plaintiff's sex or the fact she had a spouse at Vanderbilt. Exh. 1, ¶ 24 (George Decl.).

(Doc. No. 466 at 23). Defendant further argues that Plaintiff identified in her Response "no direct evidence of discrimination or retaliation." (Doc. No. 513 at 4-5).

[46] Plaintiff also makes a bald assertion that Vanderbilt somehow destroyed evidence and that Plaintiff is therefore entitled to an adverse inference against Defendant. (Doc. No. 494 at 6). This argument is supported neither by citations to the record nor by citations to case law, and the Court accordingly rejects it.

Plaintiff's claims for sex discrimination or retaliation under a direct evidence framework.[47]

On the other hand, because Plaintiff also relies on circumstantial evidence to prove her claims, the *McDonnell Douglas* burden-shifting framework does apply to Plaintiff's claims for sex discrimination and retaliation. *See e.g., Carr v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, No. 3:16-CV-00002, 2018 WL 3416695, at *2 (M.D. Tenn. July 13, 2018) ("Because Plaintiff has offered no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to Plaintiff's circumstantial evidence of unlawful discrimination."), *case dismissed sub nom. Carr v. Metro. Gov't of Nashville*, No. 18-5843, 2019 WL 3822281 (6th Cir. Feb. 14, 2019).[48]

---

[47] Indeed, irrespective of Plaintiff's bare assertion that direct evidence supports her claims, the Court's independent review of the record confirms an absence therein direct evidence (just as Defendant asserts).

[48] In her Response, Plaintiff also makes a passing reference to her "mixed motive" theory of sex discrimination (Doc. No. 494 at 1, 7), seemingly seeking thereby to incorporate by reference an argument in her own motion for summary judgment (Doc. No. 458) (which the Court has already denied) where she advances this theory. The Sixth Circuit has noted that, to support a mixed motive claim, a plaintiff need "only produce evidence sufficient to convince a jury that (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). The Sixth Circuit has further noted that *McDonnell Douglas* does not apply to a mixed motive theory. *Id.* From Defendant's Undisputed Material Facts (and Plaintiff's purported response thereto), it is undisputed (or not in genuine dispute) that Vanderbilt did not consider Plaintiff's sex in deciding to deny her tenure, (Doc. No. 467 at ¶¶ 13, 23), and Defendant asserts in its Motion and Opening Brief, as noted above, that Plaintiff has no evidence to support her claims for sex discrimination. In response to this, Plaintiff asserts that somehow Defendant has ignored the mixed motive theory and that "Vanderbilt should be deemed to have waived this issue." (Doc. No. 494 at 7). Leaving aside that it seems clear to the Court that Defendant *did* address the mixed motive theory by asserting there is no evidence of sex discrimination, direct or indirect, Defendant has met its burden to show that there is no genuine dispute of material fact on the mixed motive theory of sex discrimination by demonstrating there is no direct or circumstantial evidence that Defendant even considered Plaintiff's sex for reasons explained in this footnote and just above. With the burden back on Plaintiff, Plaintiff has plainly not met her burden by setting forth "specific facts showing that there is a genuine issue for trial" on this mixed motive theory. *Pittman*, 901 F.3d at 628. Indeed, in her Response, Plaintiff does not bother to explain her mixed motive theory in any detail, let alone cite anything in the record to support this theory or to explain why the mixed motive theory somehow allows Plaintiff to defeat Defendant's Motion. Moreover, to the extent that Plaintiff supported her "mixed motive" theory in her own briefing (Doc. No. 476-2 at 15-18) in support of her own (since denied) motion for summary judgment (Doc. No. 458) by citations to the record, the citations were of seemingly random quotations to various depositions without explanation, and as far as the Court can see, the deposition exhibits Plaintiff relies on in her briefing do not actually raise a genuine issue of material fact as to Plaintiff's mixed motive theory.

## III.      Indirect-Evidence Framework

Although the Court has concluded that Plaintiff has not offered direct evidence to support her claims, Plaintiff has offered indirect-evidence to support her claims and so the Court must next examine the *McDonnell Douglas* framework in more depth. To reiterate what the Court addressed some pages back (and what this Court has previously stated when addressing indirect-evidence claims at summary judgment like the ones subject to the instant Motion), to obtain summary judgment on Title VII, Section 1981, and THRA discrimination and retaliation claims grounded in an indirect-evidence theory:

> [T]he defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if: (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's indirect-evidence *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.

*Benitez*, 2022 WL 1283087 at *23. Accordingly, next the Court will first examine whether Defendant has shown that there is no genuine issue of material fact as to at least one of the elements in Plaintiff's indirect-evidence *prima facie* case for both sex discrimination and retaliation before then—if Defendant has made such a showing—considering whether Plaintiff has presented sufficient evidence to demonstrate a genuine issue of material fact as to any of the elements of

---

Accordingly, the mixed motive theory is unavailing to preserve Plaintiff's sex discrimination claims from summary judgment.

Plaintiff's indirect-evidence *prima facie* case as to which Defendant has in fact met its initial burden of showing a lack of genuine issue of material fact. This analysis will naturally involve an examination of the indirect-evidence *prima facie* cases for both sex discrimination and retaliation, before then turning to a review of Defendant's and Plaintiff's arguments (as well as the facts) on this point. The Court will first analyze Plaintiff's claims of sex discrimination.

      a.  <u>Sex Discrimination</u>

To establish an indirect-evidence *prima facie* case of sex discrimination under *McDonnell Douglas*, a plaintiff must establish "that (1) she is a member of the protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside of the protected class, or was treated less favorably than a similarly situated individual outside the protected class." *Li v. Jiang*, 164 F. Supp. 3d. 1012, 1019 (N.D. Ohio 2016) (citing *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015)) (considering Title VII discrimination claims regarding tenure denials). Defendant argues that there is no genuine dispute of material fact with respect to the fourth of these elements, and so the Court will examine the fourth element in more detail below.

To satisfy the fourth element of an indirect-evidence *prima facie* case of discrimination, a plaintiff must show that she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class (known as a "comparator" or "comparable"). Here, as noted above, the dispute centers on Plaintiff's denial of tenure, and thus Plaintiff must show that she was treated less favorably than a proper comparator, *i.e.*, someone outside her protected class who was truly "similarly situated" to her with respect to Vanderbilt's tenure decisions. Plaintiff "must show that the 'comparables' are similarly situated *in all respects.*" *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see*

*also Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 503 (6th Cir. 2007) (finding *prima facie* case for disparate pay not be met when plaintiff did not show other employees were similarly situated); *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006) (same).

The reference here is actually to all *material* respects; a plaintiff is "required to prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of the [comparator's]." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). *See also Yao v. Oakland University*, No. 22-1980, 2024 WL 209448, at *2 (6th Cir. Jan. 19, 2024) (noting that a plaintiff "need not demonstrate an exact correlation between herself and the allegedly similarly situated employees outside of her protected class. But, at the very least, there must be relevant similarity between them."). With respect to tenure decisions like the ones underlying the instant dispute, courts considering "Title VII discrimination claims in the context of a denial of tenure have required plaintiffs to show the supposedly 'similarly situated' comparator is nearly identical in all factors of employment, including, *inter alia*, education, experience, and research productivity." *Storrs v. Univ. of Cincinnati*, 271 F. Supp. 3d 910, 928 (S.D. Ohio 2017). In evaluating alleged discrimination in the tenure-decision context, courts also may consider whether the comparator faculty members are "in the same department and sought promotion and tenure in accordance with procedures that were applicable to both, and [whether] the time that each applied for promotion and tenure is reasonably related." *Martin v. Auburn University Montgomery*, 908 F. Supp. 2d 1259, 1267 (M.D. Ala. 2012).

### i. Application

Defendant meets its preliminary burden of showing that that there is no genuine dispute of material fact as to the fourth element of Plaintiff's indirect-evidence *prima facie* showing of sex

discrimination. In brief, Defendant argues that Plaintiff has not and cannot show a genuine dispute of material fact as to whether she was treated less favorably than a similarly situated individual outside of her protected class. Defendant argues in relevant part that:[49]

> Plaintiff . . . cannot rely on the conclusions of her purported statistical expert, Dr. David Schweidel, to show evidence of discrimination. Indeed, Dr. Schweidel concluded (even analyzing unreliable data erroneously skewed against Vanderbilt) that there was no evidence of a difference in tenure outcomes based on gender. *See* Exh. 70 at 68:10-69:22 (Schweidel Dep.). Vanderbilt's expert, Dr. Stephen Bronars, confirmed this conclusion: A statistically significant difference in the treatment of males and females cannot be shown. Exh. 9, ¶¶ 8, 10 (Bronars Decl.), Exh. 9, Ex. 1 at 2-3, 5, 10-12 (Bronars Report).

(Doc. No. 466 at 26). Defendant also argues that the undisputed facts demonstrate:

> . . . an absence of discrimination by Vanderbilt. From 2007 to 2021, there have been six tenure track faculty members hired into the Department besides Plaintiff. Exh. 1, ¶ 37 (George Decl.). Of those six, five were women; of those five women, four received tenure and are currently tenured faculty members in the Department. *Id.* The one man hired during that period was not reappointed after an interim review in 2020 and never proceeded to the tenure review process at Vanderbilt. *Id.* In other words, female tenure-track faculty members were granted tenure in the Department both before and after Plaintiff was considered, but no male tenure-track candidates were granted tenure in the Department during the same period. *Id.*, ¶ 38. Indeed, Plaintiff acknowledges that the only other spousal hire in the Department was another woman . . . and she had tenure. *Id.*, ¶ 39; Exh 18 at 91:22- 92:11 (M. Lee Dep.). Similarly, the next hire after Plaintiff's termination, by her own admission, was another woman with tenure. *Id.* In other words, the relevant evidence demonstrates there is no genuine issue of material fact as to whether Vanderbilt treated Plaintiff less favorably than her male counterparts.

---

[49] Defendant also refers to a chart located in paragraph 15 of Plaintiff's SAC. The chart itself contains (alleged) information concerning the awarding of tenure by Vanderbilt to male and female spousal hires. (Doc. No. 104 at ¶ 15). Defendant refers to the chart in support of its assertion that there is no genuine dispute of material fact as to the fourth element of the indirect-evidence *prima facie* case for sex discrimination. Yet irrespective of what the chart does or does not show, it is irrelevant for the purposes of the instant Motion, which is a motion for summary judgment. As this Court has previously explained when faced with a motion for summary judgment predicated in part upon what the movant found lacking in the non-movant's complaint: "For a defendant . . . seeking summary judgment on the grounds that the plaintiff lacks evidence sufficient to raise a jury issue as to one or more elements of a claim, the defendant (in almost all cases) needs to do this by identifying portions of the record that demonstrate the insufficiency of the evidence" and not merely "point to the allegations in the complaint" and essentially ask that they be treated as established facts (that, paradoxically, the defendant-movant claims help it even though they were originally alleged by the plaintiff). *Glenn v. Goodwill Indus. of Middle Tennessee, Inc.*, No. 3:21-CV-00465, 2025 WL 2690965, at *18 (M.D. Tenn. Sept. 19, 2025).

(Doc. No. 466 at 27).[50] Considering this, Defendant has plainly met its initial burden of showing that there is no genuine dispute of material fact as to the fourth element in Plaintiff's indirect-evidence *prima facie* case for sex discrimination with respect to her 2016 and 2019 tenure denials. Accordingly, and in line with the discussion above, the burden now shifts to Plaintiff to present sufficient evidence to demonstrate a genuine issue of material fact as to this fourth element.

Plaintiff's arguments directed at meeting this burden are unavailing. In response to Defendant's Opening Brief, Plaintiff identifies four purported male comparators (Scott Juengel, Paul Young, Paul Miller, and Ben Tran), whom she asserts were similarly situated to Plaintiff and (unlike Plaintiff, of course) received tenure. (Doc. No. 494 at 11-15). However, as an initial matter, the Court notes that Plaintiff does not actually cite the record when describing these supposed comparators, instead citing either: (a) what the Court discerns are bates numbers for documents, which conceivably *could* be contained somewhere in the voluminous record of this case, but if so are not feasible for the Court to locate; or (b) nothing at all. This has left the Court with no ability to determine whether what Plaintiff is saying is actually supported by the citations provided by Plaintiff (in those limited instances in which Plaintiff provides citations), which provides one reason to reject Plaintiff's arguments here and grant summary judgment to Defendant on Plaintiff's sex discrimination claims. Indeed, as one district court in this Circuit noted when the party opposing the summary-judgment motion under consideration had failed to make proper citations to the record:

> the non-moving party must cite specific portions of the record in opposition to the moving party, and the Court is not required to search the record for evidence that may preclude summary judgment. As a result [of the non-moving party failing to

---

[50] As noted above with respect to Defendant's Undisputed Material Facts, Defendant's Opening Brief (Doc. No. 466) refers throughout to "Exhibits" and "Exhs." These are the exhibits to Defendant's Undisputed Material Facts which may be found as the attachments titled with a corresponding exhibit number (some in redacted form) to the filings at Docket Nos. 467-472.

> cite specific portions of the record in opposition to a motion for summary judgment], it would be entirely within the Court's discretion to rely solely on the facts presented by [the moving party] in deciding the instant motion.

*Bluwav Systems, LLC v. Durney*, No. 09-13878, 2011 WL 5375200, at *7 (E.D. Mich. Nov. 7, 2011).

Even if the Court were to assume *arguendo* that what Plaintiff asserts *is* supported by the record, Plaintiff's arguments nevertheless would be unavailing. As noted above, Plaintiff lists four purported "comparators" to show that there is a genuine dispute of material fact as to the fourth element of Plaintiff's indirect-evidence *prima facie* sex discrimination case. (Doc. No. 494 at 11-14). Although Plaintiff lists and describes these four comparators, Plaintiff does very little to actually show that these individuals could be valid comparators for Plaintiff. For instance, although Plaintiff explains how the tenure files of her purported comparators are similar to Plaintiff's tenure file (particularly with respect to comparing Plaintiff's and the comparators' research and publications), she does not explain how these "comparators" are otherwise similar to Plaintiff in terms of education or other experience. This will not do; as the Court explained above, courts consider more than just research and publications when considering discrimination with respect to tenure decisions and also consider education and experience of purported comparators. *See Storrs*, 271 F. Supp. 3d at 928 (noting that courts also consider education and experience when considering tenure decisions). *See also Hellmann–Blumberg v. Univ. of the Pac.*, No. 2:12–cv–286, 2014 WL 1025111, at *4 (E.D. Cal. Mar. 13, 2014) ("In determining whether parties are similarly situated, the Court looks to specific statistical data relating to the objective criteria for tenure, including education, experience, and number of published works as compared to others who had been granted tenure.").

Here, Plaintiff has provided *no* information on her purported comparators' respective education or experience and how it compares to Plaintiff's. This provides at least one reason to conclude that there is no issue of genuine dispute as to whether Plaintiff's comparators are actually similarly situated. Indeed, Plaintiff even concedes that one of her purported comparators (Scott Juengel) is in a different department (the Department of English) (Doc. No. 494 at 14) than Plaintiff (who, as noted above, is in the Department of Art and Architecture). (Doc. No. 467 at ¶ 7). Moreover, as Defendant points out (with supporting citations to the record, unlike Plaintiff), each of Plaintiff's other purported comparators are "from different academic departments, are from vastly distinct academic disciplines, went up for tenure at different times, and/or were evaluated by different decisionmakers." (Doc. No. 513 at 7, at 7-9). This provides yet another reason to conclude that Plaintiff has failed to establish a genuine issue of material fact as to the fourth element of her indirect-evidence *prima facie* case of sex discrimination.

In conclusion, faced with Defendant showing a lack of genuine issue of material fact as to the fourth element of the indirect-evidence *prima facie* case of sex discrimination, Plaintiff has failed to satisfy her burden to present sufficient evidence to demonstrate a genuine issue of material fact as to the fourth element of that indirect-evidence *prima facie* case. Accordingly, the Court will grant Defendant summary judgment on Plaintiff's sex discrimination claims.[51]

---

[51] To the extent that Plaintiff relies on her "expert statistician, Professor David Schweidel," (Doc. No. 494 at 15) this is also unavailing. Plaintiff includes in her Response uncited and unexplained portions of the expert report of David Schweidel. In relevant part this includes the following text from that expert report:

> I was presented with data pertaining to spousal hires. The data consist of names, hiring rank, department, and hire date. For individuals who began on the tenure track, the data also include the tenure decision if it had already been made. To the provided data, I appended the gender of the individuals by searching for their websites. The data used for the analysis is presented in the Appendix.

> There were 35 cases for which employees were on the tenure track and a tenure decision was recorded. Of the 35 employees, 17 were female and 18 were male. Among the 35 employees, 30 employees were granted tenure (85.7%) and 5 employees were not (14.3%).

b. <u>Retaliation</u>

For a plaintiff to make out an indirect-evidence *prima facie* case of retaliation, a Plaintiff must show that "'(1) [ ] she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against [Plaintiff], and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citing *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)). Plaintiff and Defendant dispute whether the third element (in part) and the fourth element of Plaintiff's indirect-evidence *prima facie* case of retaliation have been met. Accordingly, below the Court will further explicate the third and fourth elements of the above quoted test, before then analyzing the parties' arguments on this point below.

---

Examining the decisions by gender, 17 of the 18 male employees in the data were granted tenure (94.4%). In contrast, 13 of the 17 females were granted tenure (76.5%). That is, there is an 11.9% chance that the differences that we observe in the tendencies for male and female employees to be tenured arise from chance and do not arise from an underlying difference in the probability of male and female employees being tenured.

(Doc. No. 494 at 15-16). Plaintiff relies on this report to argue that "it is more likely than not that the underlying difference [in granting tenure] arises from intentional discrimination, not chance." (*Id.* at 16). But Plaintiff has failed to persuade the Court that the expert report serves to show that there is a genuine issue of material fact as to the fourth element of Plaintiff's indirect-evidence *prima facie* case. First, Plaintiff does not actually provide any citation for her long quotation of David Schweidel's report. Second, Plaintiff does nothing to explain how this report actually shows that there is a genuine dispute of material fact, but instead merely argues that the report means that Vanderbilt is more likely than not to have discriminated. The making of this general argument will not suffice, because Plaintiff now must do something much more specific—carry her burden to establish a genuine dispute of material fact as to the fourth element of the indirect-evidence *prima facie* case of sex discrimination—and Plaintiff simply does not do this. *See e.g., Big Dipper Ent., L.L.C. v. City of Warren*, 641 F.3d 715, 719 (6th Cir. 2011) ("To create a genuine issue of material fact, a party must do more than file an expert report with the district court. It was [plaintiff's] job, not the district court's, to present argument as to how [plaintiff's expert] report created genuine issues of material fact."); *Carhartt, Inc. v. Innovative Textiles, Inc.*, No. 17-13604, 2020 WL 1984104, at *4 (E.D. Mich. Apr. 27, 2020) ("However, an expert report alone can rarely create a question of fact"); *Attias v. CareFirst, Inc.*, No. 15-CV-882 (CRC), 2023 WL 5952052, at *7 (D.D.C. Sept. 13, 2023) ("But expert opinion alone cannot create a genuine dispute of fact.").

With respect to the third element, to show that an employer's challenged action amounts to an "adverse employment action," a plaintiff must show that the "employer's challenged action would have been material to a reasonable employee," which means that it likely would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006) (adopting the formulation set forth by the Seventh Circuit and the District of Columbia Circuit). A significant distinction was described by the District of the District of Columbia:

> [T]here is a difference between "adverse actions" that support a claim for discrimination and "materially adverse actions" that support a claim for retaliation. Unlike discriminatory actions, retaliatory actions need not be employment-related or even occur in the workplace, nor must they result in "a materially adverse change in the terms or conditions of one's employment." Nonetheless, the alleged retaliatory action must produce "an injury or harm." The injury or harm must be "material," meaning that it could "dissuade a reasonable worker from making or supporting a charge of discrimination."

*Doe 1 v. George Washington Univ.*, 369 F. Supp. 3d 49, 73 (D.D.C. 2019) (quoting *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 116 (D.D.C. 2014)) (internal alterations and citations omitted).

Thus, the standard for showing an adverse employment action for a retaliation claim is lower than for a discrimination claim. The Sixth Circuit has noted that "the burden of establishing a *prima facie* case of retaliation is not onerous[.]" *Hatchett*, 186 F. App'x at 550 (internal quotation marks and citation omitted). Contributing to such lack of onerousness is the above-referenced breadth of the notion of "adverse employment action" in the context of retaliation claims in particular. *See Niswander*, 529 F.3d at 720 ("In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace. The retaliation provision instead protects employees from conduct that would have dissuaded a reasonable worker from making or supporting a charge of discrimination."

(citation and internal quotation marks omitted)). Importantly, although the burden to establish an adverse action to support an indirect-evidence *prima facie* case of retaliation is not onerous, the burden does exist for Plaintiff. As the Sixth Circuit has explained "[t]rivial episodes of unpleasantness or admonition, or other *de minimis* employment actions, standing alone, cannot supply legally sufficient evidence of actionable material discipline or retaliation, even if they were arguably impelled by protected activity." *Kelly v. Lambda Research, Inc.,* 89 F. App'x 535, 545 (6th Cir. 2004) (collecting cases).

With respect to the fourth element of an indirect-evidence *prima facie* case of retaliation, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action" or otherwise engaged in protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "[T]he plaintiffs must, among other things, show 'a causal link' between a protected activity and the adverse employment action. That is, the evidence 'must be sufficient to raise an inference that the protected activity,' such as complaining to management about racial harassment, 'was the likely reason for the adverse action.'" *Fite v. Comtide Nashville, LLC,* 686 F. Supp. 2d 735, 753 (M.D. Tenn. 2010) (quoting *Wade v. Knoxville Utils, Bd.*, 259 F.3d 452, 463 (6th Cir. 2001)). "[T]o establish such a causal connection, a plaintiff must show some type of retaliatory intent. [The plaintiff] therefore ha[s] to establish that the true motivation for [the adverse employment action(s)] were not for the reasons given, but were instead based on the fact that [s]he [engaged in protected conduct]." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016).[52] Put

---

[52] Claims under Title VII, Section 1981, and the THRA all require but-for causation. *See Khalaf v. Ford Motor Co.*, 973 F.3d 469, 489 (6th Cir. 2020) (noting that Section 1981 claims require but-for causation); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (clarifying that in the context of Title VII retaliation claims, the proper test for causation is a "but-for" test); *Murphy v. AHF/Cent. States, Inc.*, No. 3:12–1193, 2014 WL 4384345, at *8 (M. D. Tenn. Sept. 3, 2014) (applying but for causation to THRA retaliation claims).

another way, the fourth element of a retaliation claim requires Plaintiff to establish a genuine dispute of material fact as to whether "but-for" a retaliatory motive, Defendant would not have taken the adverse action.

Plaintiff bases her retaliation claims on two incidents: one with respect to the assignment to Plaintiff of a particular report to write, and one with respect to the denial of Plaintiff's tenure in 2019. The Court will address each of these in turn.

### i. The SACS Report

First, Plaintiff and Defendant dispute whether Plaintiff's assignment by Professor Kevin Murphy[53] to work on the "Southern Association of Colleges and Schools Commission on Colleges accreditation report [(hereinafter, "SACS Report")]" (Doc. No. 466 at 34) constitutes an adverse action such as to satisfy the third element of Plaintiff's indirect-evidence *prima facie* case of retaliation. Defendant asserts that the undisputed facts show that working on the SACS Report (as is undisputed by Plaintiff in her Response) was an:

> . . . existing term of her employment, not a new one. *See* Exh. 10 at 26; Ex. 11 at 27 (Faculty Manual). It indisputably would have been unusual for Professor Murphy not to assign service activities to a faculty member, and he believed it was important for Plaintiff's tenure review that she have done sufficient service. Exh. 4, ¶¶ 29-30 (Murphy Decl.). Moreover, Plaintiff admitted the project would not be "too onerous." Exh. 18 at 78:19-79:10. She further testified that she spent 25 or 30 hours on it—just a couple of days' work. *Id.* at 78:12-18. And Professor Murphy arranged for her to have help in doing the report. *Id.* Notably, Plaintiff's colleague, Professor Moodey, was responsible for the SACS report for several years, including the year that she successfully applied for tenure. Exh. 4, ¶ 28 (Murphy Decl.); Exh. 7, ¶¶ 18-19 (Moodey Decl.).

---

[53] Defendant also asserts that Plaintiff's meeting with Professor Kevin Murphy did not constitute an adverse employment action for the purposes of Plaintiff's retaliation claims. (Doc. No. 466 at 34) Plaintiff does not argue otherwise, and so the Court will not analyze whether this meeting constituted an adverse employment action such as to satisfy the third prong of the indirect-evidence *prima facie* case for retaliation and instead will assume that this meeting did not constitute an adverse employment action.

(Doc. No. 466 at 35). In light of the above, Defendant asserts that being assigned the SACS report could not "deter someone from" making or supporting a charge of discrimination so that Plaintiff being assigned the SACS Report could not constitute an adverse employment action (and thus satisfy the third prong of the indirect-evidence *prima facie* case for retaliation). (*Id.* at 35). Finding this reasoning persuasive, the Court concludes that Defendant has satisfied its initial burden of showing that there is no genuine issue of material fact as to the third element (an adverse employment action) of Plaintiff's indirect-evidence *prima facie* case for retaliation with respect to being assigned the SACS Report. Thus, as above, the burden shifts to Plaintiff to show sufficient evidence to demonstrate a genuine issue of material fact as to this third element.

In response, Plaintiff asserts (baldly) that "[i]t is clear that it was the timing of the assignment to do the SACS report that made such an assignment sufficient to deter a faculty member in the process of preparing her research materials for tenure evaluation from filing a grievance or other protected activity." (Doc. No. 494 at 17).[54] Plaintiff then asserts, without any sort of specific citation to the record:

> There are issues of fact concerning the difficulty and time involved in performing the SACS assignment as demonstrated by the Affidavit of Professor Laura Junker. The Sixth Circuit has recently held that delays in scheduling a hearing for a grievance or another similar proceeding was sufficient to constitute an adverse action sufficient to dissuade a reasonable person from protected activity [and that the] fact that [the SACS Report] interfered with plaintiff Lee's preparation for her tenure review makes the work assignment sufficient to constitute an adverse employment action.

---

[54] Plaintiff also refers (Doc. No. 494 at 17) to an argument in her memorandum (Doc. No. 476-2) in support of her own motion for summary judgment (Doc. No. 458) where she purportedly argued that being assigned the SACS was an adverse action. But in her memorandum (Doc. No. 476-2), Plaintiff never actually addresses whether the SACS assignment was an adverse action.

(Doc. No. 494 at 17). [55] This will not do. Plaintiff must do more than simply assert that the SACS assignment "could" constitute an adverse employment action by somehow interfering with her tenure review or delaying Plaintiff from engaging in protected activity. *Cf. Benitez*, 2022 WL 1283087, at *43 (finding that a non-movant, having failed to present evidence with the required specificity in response to a motion for summary judgment, was unable to proceed on an indirect-evidence theory of discrimination ). The only piece of evidence in the record that Plaintiff cites is a 1999 affidavit of a Vanderbilt professor—located, as far as the Court can tell, at Docket No. 426-1—which the Court discerns does not actually address the SACS Report *at all*. In other words, Plaintiff has not met her burden to show that there is a genuine dispute of material fact as to whether the assignment of the SACS Report to Plaintiff was an adverse employment action. Thus, having failed to present evidence with nearly the required specificity on this point, Plaintiff has not shown that there is a genuine dispute of material fact as to whether the assignment of the SACS Report to Plaintiff constitutes an adverse employment action. Accordingly, Plaintiff cannot use the assignment of the SACS Report to Plaintiff to establish the third element of an indirect-evidence prima facie case of retaliation. [56]

### ii. *2016 Grievance and 2019 Tenure Denial*

Plaintiff also proceeds on the theory that the denial of her tenure in 2019 was in retaliation for the filing of her 2016 grievance. Defendant does not contest that such denial is an adverse

---

[55] What Plaintiff appears to be arguing here is that the assignment of the SACS Report could have *delayed* Plaintiff from filing a grievance or taking any other protected activity and thus could have constituted an adverse employment action.

[56] Although Plaintiff and Defendant also dispute whether there is a genuine issue of material fact as to the fourth element of the indirect-evidence *prima facie* case of retaliation with respect to the SACS Report assignment, as the Court has already determined that there is no genuine dispute of material fact as to the third element of the *prima facie* case with respect to the SACS Report, the Court will not reach this issue herein.

action that satisfies the third element of the indirect-evidence *prima facie* case of retaliation. But

Defendant does assert that the fourth element has not been met. In relevant part, Defendant asserts

that:

> It is indisputable that Dean Geer made the decision to deny tenure [to Plaintiff] in 2019 for legitimate, non-discriminatory reasons, and Plaintiff cannot establish that decision was made in retaliation for her 2016 grievance. The passage of three years between Plaintiff's grievance and her tenure denial is in and of itself an obstacle to establishing retaliation. *See* Dkt. 244 at 34 (citing Altieri v. Albany Pub. Libr., 172 F. App'x 331, 333-34 (2d Cir. 2006). Furthermore, Plaintiff's 2018 external review letters, lack of progress on her second book, and two under-researched articles constitute legitimate reasons for denying tenure. *See* Kenney v. Aspen Techs., Inc., 965 F.3d 443, 450 (6th Cir. 2020) (finding that plaintiff failed to show causal connection between protected conduct and termination because there were "intervening cause[s] justifying" termination). Moreover, Dean Geer testified without contradiction that he did not consider Plaintiff's grievance in evaluating her tenure file in 2018-2019. Exh. 2, ¶¶ 8, 26, 28-29 (Decl. of J. Geer); Exh. 36 at 34:19-35:11 (Geer Dep.). *See also* Exh. 37 at 1, 4-5 (2021 Grievance Committee Report). In addition, Dean Geer was not a target of or witness in Plaintiff's grievance. *See* Exh. 2, at ¶ 8 (Decl. of J. Geer). Furthermore, Dean Geer does not recall even "being aware of that grievance at all prior to this litigation." Exh. 2, ¶ 8 (Decl. of J. Geer).

(Doc. No. 466 at 35-36) (footnotes omitted). Defendant also addresses Plaintiff's so-called cat's

paw theory[57] (contrary to Plaintiff's arguments that Defendant did not address it (Doc. No. 494 at

2, 16, 18)) by arguing:

---

[57] Plaintiff mentions the so-called cat's paw theory in passing (and without analysis) in her Response (Doc. No. 494 at 2, 16, 18). The cat's paw theory has a name—derived from a 17th century fable about, of all things, a cat that is duped by a monkey into doing the monkey's bidding—that the Sixth Circuit describes as entirely "useless" in conveying what the theory actually is; it is a "theory of vicarious liability allows a plaintiff to hold his employer liable for the animus of an intermediate actor 'who was not charged with making the ultimate employment decision.'" *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 210 (6th Cir. 2021) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 421–22 (2011)). As the Tenth Circuit has explained, "[i]n the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decision-making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). Plaintiff invoked the cat's paw theory in her opening brief (476-2 at 25-26) in support of her own (since denied) motion for summary judgment, (Doc. No. 458), but does nothing to explain this theory in her Response to Defendant's Motion. The Court perceives that Plaintiff may be attempting to suggest that Dean Geer, in denying Plaintiff's tenure in 2019, was influenced by other individuals in Vanderbilt (who themselves possessed a retaliatory motive) to deny tenure to Plaintiff. However, Plaintiff does nothing to show that Dean Geer could have been infected with "some

Plaintiff may claim that, because Dean Geer noted that the Department's 4-3 vote was "itself a cause for concern," Exh. 59 at 1 (Geer Memo), some retaliatory motive among her faculty peers infected Dean Geer's decision, but there is no evidence of that. Rather, Dean Geer said upfront that in his "own detailed reading of the file I too have some serious concerns." *Id.* He found "that the record of research does not meet the standard of 'excellence in research' required for promotion and tenure at Vanderbilt." *Id. See also* Exh 2, ¶ 33. Moreover, he testified that even if the faculty vote had been unanimous in favor of Plaintiff, he would have denied tenure. *Id.*, ¶ 33.

And even if the faculty's divided vote had been a "but for" cause of Geer's decision, Plaintiff cannot show that vote was retaliatory. In her complaint, Plaintiff accuses Kevin Murphy of retaliation, but he voted in her favor. Exh. 4, ¶ 38 (Murphy Decl.). The now-deceased Christopher Johns and Vivien Fryd voted against tenure, but they both indisputably put forth legitimate criticisms of Plaintiff's recent articles. Exh. 5, ¶¶ 11-12, 18 (Crawford Decl.); Exh. 3, ¶¶ 10-12, 17-19, and 22 (Robinson Decl.). One of those articles fell within the scope of the expertise of Professor Johns, who expressed concern about the quality of the article. *See* Exh. 55 at 6 (2018 Dept. Minutes); Exh. 5, ¶ 12 (Crawford Decl.); Exh. 50 at 6-7 (Ad Hoc Committee Report). The other of those articles fell within the scope of the expertise of Departmental colleague Vivien Fryd, who expressed similar concerns about the quality of Plaintiff's research and the validity of arguments in the article. *See id.*; Exh. 6, ¶¶ 33-34, 50 (Fryd Decl.).

And there was a divided Department vote even without the votes of Professors Johns and Fryd because a third member of the faculty voted against tenure: Professor Elizabeth Moodey. She did not have tenure in 2015 and so did not vote in Plaintiff's first tenure review. Exh. 7, ¶¶ 3-4 (Moodey Decl.). With respect to the 2018 file, however, Moodey had serious concerns. Professor Moodey, unaware of the grievance, voted against tenure, *id.*,¶¶ 5, 13-14, and that fact, in and of itself, would have generated a divided departmental vote and raised a red flag because divided faculty votes are rare. *See* Exh. 36 at 26:8-27:7 (Geer Dep.); Exh. 35 at 34:1-35:1 (George Dep.).

(Doc. No. 466 at 36-37). Here, Defendant is pointing to evidence supposedly showing both that

Dean Geer did not act with a retaliatory motive of his own *and* that Dean Geer was not infected

by some retaliatory motive by other faculty members at Vanderbilt. And based on this evidence,

---

retaliatory motive" (Doc. No. 466 at 36) from intermediate actors at Vanderbilt and does nothing to show that other actors at Vanderbilt may have had any retaliatory motive at all. The Court will not make Plaintiff's arguments for her, *cf. Roe v. Lowe*, No. 3:24-CV-00368, 2024 WL 4778042, at *8 n.12 (M.D. Tenn. Nov. 13, 2024) ("Ultimately, it is not the Court's role to construct a plaintiff's legal arguments."), and thus Plaintiff's invocation of the cat's paw theory is unavailing.

Defendant argues that Plaintiff cannot show a genuine issue of material fact as to the fourth element (causation) of the indirect-evidence *prima facie* case of retaliation. The Court is persuaded by this evidentiary showing and the argument therefrom, and thus the Court concludes that Defendant has satisfied its initial burden of showing that there is no genuine issue of material fact as to the fourth element (causation) of Plaintiff's indirect-evidence *prima facie* case for retaliation with respect to the denial of Plaintiff's tenure in 2019 (purportedly) in retaliation for the filing of Plaintiff's 2016 grievance. Because Defendant has met its initial burden to show that there is no genuine dispute of material fact with respect to the fourth element of the indirect-evidence *prima facie* case for retaliation, the burden now shifts to Plaintiff to show that there is a genuine dispute of material fact with respect to the fourth element.

Plaintiff's attempts to meet that burden, (Doc. No. 494 at 16-18), are completely unavailing. Plaintiff devotes some three pages of her Response to arguing (among other things) that she has shown that there is a genuine dispute of material fact as to the fourth element of the indirect-evidence *prima facie* case of retaliation (as based on the denial of Plaintiff's tenure in 2019). Yet the Court need not delve into any of Plaintiff's arguments for a simple reason: they are not supported by citations to the record. Plaintiff seemingly attempts to provide citations to the record. However, Plaintiff's citations throughout the section of her Response addressing her retaliation claims (with respect to the denial of Plaintiff's tenure in 2019 (purportedly) in retaliation for the 2016 grievance) (Doc. No. 494 at 16-18) are simply incomplete—with many even missing page numbers directing the Court to a particular part of the record—and give the Court *no* indication of where Plaintiff's cited evidence exists in the record. *See e.g., Doran v. McDonough*, No. 20-3694, 2021 WL 5194076, at *6 (6th Cir. Nov. 9, 2021) ("We draw reasonable inferences in favor of the non-moving party, but once a moving party identifies record materials showing

there is no genuine issue of material fact, *the non-moving party must identify material in the record that demonstrates . . . a genuine dispute of material fact*." (emphasis added)); *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 395 (6th Cir. 2019) ("But if the moving party shows the lack of a genuine issue of material fact on an element of the nonmoving party's case, the nonmoving party must set forth specific facts showing a triable issue."). Where a non-movant has failed to cite "*specific facts* showing that there is a genuine issue for trial*,*"[58] courts regularly find that summary judgment is justified. *Dickens v. Interstate Brands Corp.*, No. 06-2868-STA, 2008 WL 2570864, at *6 (W.D. Tenn. June 25, 2008) (emphasis added), *aff'd*, 384 F. App'x 465 (6th Cir. 2010). *See also GPH Louisville Hillcreek LLC v. Redwood Holdings, LLC*, No. 3:21-CV-63-RGJ, 2023 WL 3083596, at *8 (W.D. Ky. Apr. 25, 2023) (granting motion for partial summary judgment where non-movants "failed to establish that a factual dispute exists by citation to facts in the record."). Indeed, as one district court put it when granting a motion for summary judgment[59]:

> It is [the p]laintiffs' burden [when plaintiff is the non-movant] to make specific citations to the summary judgment record. *See Ragas*, 136 F.3d at 458; *Stults*, 76 F.3d at 655. Although the Court has reviewed what it has before it, the Court will not—and indeed is not required to—scour the record in this matter to determine whether Plaintiffs could create a genuine issue of material fact as to each element of their claims. *See* E.D. Tex. L.R. CV–56(d). Plaintiffs' response contains very few citations to the summary judgment record, and those citations provided lack specificity. *See, e.g.*, Dkt. 23 at 16 (citing generally to Exhibit 2A–19 pages of account information—without any specific pinpoint citations to support the proposition that "through its communications and demands, Defendants imposed wrongful charges (i.e. penalties, attorney fees, corporate advances) on Plaintiffs' mortgage account thus using a deceptive means to collect a debt."). General and sporadic references to the summary judgment record are not sufficient. *See* E.D. Tex L.R. CV–56(d) (stating that summary judgment citations should be referred to by page and, if possible, by line of the summary judgment evidence). Plaintiffs are required to show how the evidence creates an issue of material fact by citing to specific portions of the record. They have not done so here.

---

[58] The quoted language would have been more precise had it stated "specific evidence" rather than "specific facts."

[59] The district court here was applying its own local rules, but elucidating principles that the Court finds necessary to illuminate here.

*Smith v. JPMorgan Chase Bank, N.A.*, No. 4:10-CV-533, 2011 WL 6217783, at *5 (E.D. Tex. Dec. 14, 2011) (footnotes omitted), *report and recommendation adopted*, No. 4:10-CV-533, 2012 WL 966485 (E.D. Tex. Mar. 20, 2012), *aff'd*, 519 F. App'x 861 (5th Cir. 2013). Where Plaintiff has failed to provide the requisite specific citations to the record, the Court will not rifle through the record in an attempt to find a genuine dispute of material fact where Plaintiff has failed to identify one. As the Sixth Circuit has explained, district courts "cannot be faulted for not doing the work of plaintiff's counsel and undertaking a detailed review of the entire record." *Emerson*, 446 F. App'x at 736. "A district court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact. Judges are not like pigs, hunting for truffles that might be buried in the record." *Id.* (internal citations and quotation marks omitted). Having failed to present evidence with nearly the required specificity on this point, with respect to the denial of Plaintiff's tenure in 2019, Plaintiff has not met her burden to show a genuine dispute of material fact as to the fourth element of an indirect-evidence *prima facie* case of retaliation based on the denial to her of tenure in 2019. And, with her other alternative for making such a case (based on Plaintiff being assigned to work on the SACS Report) having failed, Plaintiff cannot prevail on an indirect-evidence theory with respect to her retaliation claims.

As noted above, Plaintiff also lacks direct evidence to support such a claim. Therefore, Defendant will be granted summary judgment as to Plaintiff's retaliation claims, in addition to being granted summary judgment as to Plaintiff's sex discrimination claims. In other words, Defendant will be granted summary judgment as to all of Plaintiff's claims.

<u>CONCLUSION</u>

Accordingly, for the reasons described herein, the Court will **GRANT** Defendant's Motion (Doc. No. 465) in its entirety and grant summary judgment to Defendant on all of Plaintiff's claims.

Additionally, for the reasons described above, the Court will **GRANT** in part and **DENY** in part Defendant's Motion to Strike (Doc. No. 533). Additionally, because the Court is granting summary judgment to Defendant on all of Plaintiff's claims, all trial-related motions in this matter (Doc. Nos. 523, 535, 572, 580, 592, 594, 602, 607, 619) will be **DENIED** as moot. Finally, a handful of other motions (Doc. Nos. 582, 595, 605) will remain pending for the Court to decide.

An appropriate accompanying order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE